[No. 27935-5-II. Division Two. December 20, 2002.]

LOUIS D. SEAMAN, ET AL., *Appellants*, v. TODD KARR, ET AL., *Respondents*.

*Timothy L. Healy* (of *Benjamin Pollock & Healy*), for appellants.

*Gerald A. Horne, Prosecuting Attorney for Pierce County,* and *Bertha B. Fitzer* and *Ronald La Mar Williams, Deputies,* for respondents.

HUNT, C.J. — Louis D. and Socorro R. Seaman appeal the summary judgment dismissal of their civil rights action against the Pierce County Sheriff's Department, the Lakewood Police Department, the Tacoma Police Department, and various individual law enforcement officers (Defendants). The Seamans argue that the trial court erred in granting summary judgment to the Defendants on grounds of qualified immunity. The Seamans contend that there is

sufficient evidence for a fact finder to conclude that the officers (1) unreasonably detained the Seamans, (2) used excessive force, and (3) intentionally inflicted emotional distress.

We agree in part and reverse the summary judgment dismissal of the Seamans' emotional distress and unlawful detention claims, except as to defendants Jack Nasworthy and Jane McCarthy, whose dismissal from the action we affirm. We also affirm the trial court's summary judgment dismissal of the Seamans' remaining claims, including excessive force.

## FACTS[1]

On April 25, 1999, the Seamans moved into their new residence at 3511 South Orchard, apartment C-7, in Tacoma. Several days later, they placed their name on the mailbox in the entryway. Documentation of the Seamans' tenancy was complete in April 1999, and it was common knowledge to the apartment management and tenants that the Seamans occupied apartment C-7.

Mr. and Mrs. Seaman were 67 and 37 years of age, respectively, and Caucasian and Filipino, respectively. They were not connected to a shooting in Lakewood a few weeks later.

### I. THE PREVIOUS SHOOTING

On May 13, 1999, two men were shot at the 5400 block of Boston Avenue Southwest in Lakewood. One victim, Albert Turner,[2] died at the scene; the other, Dante Antwan Minor, refused to cooperate with detectives. The shooter escaped in

---

[1] For purposes of reviewing summary judgment, we take the Seamans' supported allegations of fact as true. *See Kalina v. Fletcher*, 522 U.S. 118, 122, 118 S. Ct. 502, 139 L. Ed. 2d 471 (1997); *Gomez v. Toledo*, 446 U.S. 635, 637 n.3, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980).

[2] Albert Turner was Randolph Johnson's cousin. On April 19, 1999, Johnson shot Robert Rodriguez. Rodriguez had threatened revenge on Johnson's family, which led to the shooting of Turner.

a blue van and left it in a parking lot at 3511 South Orchard, the Seamans' apartment complex. The murder weapon, a 9 mm pistol, was not found.

The following day, Pierce County sheriff's detectives took Juan Rodriguez-Maldonado, the driver of the getaway van, and Hugo Perez-Ortiz, the shooter, into custody. Rodriguez-Maldonado described several people who had been in the van at the time of the shooting, identifying one as Hector Mateo. Subsequent investigation revealed several known drug dealers of Puerto Rican descent linked to Rodriguez-Maldonado, Perez-Ortiz, and the previous shooting of Perez-Ortiz's cousin.

Detectives found the abandoned blue van. It was registered to Mateo, who listed his address as 3511 South Orchard, apartment C-7. The Pierce County Sheriff's Department believed that Mateo and the murder weapon were at this apartment

## II. Search Warrant

On May 18, the Pierce County Sheriff's Department obtained a search warrant for 3511 South Orchard, apartment C-7, and an arrest warrant for Mateo. Believing that the apartment managers had tipped off other residents about previous police investigations, the sheriff's department did not contact the management office to check the names of the apartment's current occupants. Thus, they did not know that Mateo had moved out or that the Seamans now resided in apartment C-7.

The sheriff's department determined that execution of this search warrant was high risk because of the two previous shootings and the drug- and gang-related violence in which the suspects were involved. Consequently, the sheriff's department requested and received assistance from the Tacoma Police Department Special Weapons and Tactic (SWAT) team.

## A. PRELIMINARY SWAT TEAM BRIEFING

At an 8:00 A.M., May 20, briefing, the SWAT team reviewed with the Pierce County Sheriff's Department an operation order for executing the high-risk search warrant. The operation order named Robert Rodriguez as the primary homicide suspect, described him as a 20-year-old Hispanic male, 150 pounds, and included his picture. The operation order also named Marcos L. Serrano as a suspect, describing him as a "DARK[-]SKINNED PUERTO RICAN OR BLACK MALE." Clerk's Papers (CP) at 157. The operation order cautioned:

> THE PERSON(S) INVOLVED [IN THE SHOOTING] ARE KNOWN TO BE VERY VIOLENT, ARMED WITH HAND-GUNS. THEY HAVE BEEN INVOLVED IN NUMEROUS HOMICIDES, SHOOTINGS, AND DURING PREVIOUS AR-REST SITUATIONS HAVE BEEN ARMED. THEY ARE ALSO REPORTED TO BE IN POSSESSION OF BALLISTIC VESTS. . . . DURING [SERVICE OF ANOTHER WARRANT] IN LAKEWOOD, [SOME OF THESE SAME] SUSPECTS INTENTIONALLY SET THE APARTMENT ON FIRE TO DESTROY PERISHABLE EVIDENCE. THE SUSPECTS VIO-LENTLY RESISTED ARREST WHILE THE APARTMENT WAS ON FIRE, OTHERS BAILED OUT A BACK WINDOW TO TRY TO ESCAPE. . . . THE SUSPECTS AT THIS LOCA-TION ARE BELIEVED TO BE ORGANIZED CRIMINALS, DEALING IN NARCOTICS. IT IS UNCERTAIN HOW MANY OR WHO WILL BE PRESENT. *SOME OF THE SUSPECTS ARE CUBAN (BLACK) MALES, OTHERS ARE PUERTO RICAN OR MEXICAN MALES. AGES RANGE FROM 20'S TO 40'S.*

CP at 157 (emphasis added).

The operation order further stated that (1) no children, elderly persons, or dogs were believed to be at the location, and (2) the apartment management office was to be contacted and advised of the situation during and after service of the search warrant.

## B. Execution of Search Warrant

About 9:30 A.M., several SWAT officers approached the Seamans' residence; they wore dark uniforms, helmets, and stockings covering their faces, and carried machine guns. They moved past the mailbox, which displayed the Seamans' name, to apartment C-7. To maintain the element of surprise, the SWAT team knocked and announced at the rear sliding glass door.

### 1. Entry of Apartment

Seeing no movement inside, the SWAT team forcibly opened the apartment door and released a "distraction device." The distraction device exploded loudly; it shattered the sliding glass door, blowing glass into the living room; it dispersed smoke everywhere and ignited the carpet. When they entered the apartment, instead of finding the individuals described in the operation orders, the SWAT team found a terrified elderly white male, a middle-aged Filipino female, and two large dogs. Nonetheless, the SWAT team proceeded as planned.

Mr. and Mrs. Seaman, dressed casually, were preparing breakfast. Suddenly, unknown invaders in black "ninja suits," with masks over their faces, rushed in from several different directions, carrying machine guns and yelling, "[H]ut, hut, hut . . . ." CP at 124. Fearing for their lives, Mr. Seaman froze and Mrs. Seaman ran to the master bathroom, slammed the door shut, turned off the light, and hid in a corner behind the door, crying and shaking. They had no idea that the armed men were the police.

The Defendants pointed machine guns at Mr. Seaman's face as they advanced toward him yelling, "[H]ut, hut, hut . . . ." CP at 125. Mr. Seaman neither resisted nor provoked them. Several Defendants hit Mr. Seaman's back, threw him facedown to the floor, and landed on top of him, causing him breathing difficulty. As several Defendants aimed loaded machine guns at Mr. Seaman, one Defendant

told him that if he moved, he would be shot. The Defendants then forced Mr. Seaman's arms behind his back, twisting his left wrist and handcuffing him so tightly that his wrists hurt, he began to cry, and he begged Defendants not to hurt him.

Still in hiding, Mrs. Seaman heard her husband's cries and believed they were being robbed. When she opened the bathroom door, the Defendants pointed machine guns in her face and yelled, "[G]et out." She complied. Without provocation, one Defendant threw her face-first down on the bed. They forced her arms behind her back, handcuffed her wrists so tightly that they hurt, pulled her off the bed, and ordered her to the hallway, still pointing loaded machine guns at her. She was crying and thought she was going to die.

Then, Mrs. Seaman read "Police" on one Defendant's back and asked, "[Y]ou guys are the police?" When she asked why they had broken into their residence, Defendants replied that they would tell her in a minute. CP at 133.

The Tacoma Police SWAT team left approximately 20 minutes after entering the apartment, shortly after Pierce County detectives arrived to continue the investigation.

### 2. Mistaken Identity of Occupants

Mrs. Seaman told the Defendants that (1) they must have made a mistake because the Seamans had done nothing wrong, and (2) they had the wrong people. Defendants asked Mrs. Seaman her name, her husband's name, and how long they had resided in the apartment. She told the Defendants their names and that they had just moved in the previous month.

Around 9:40 A.M., 10 minutes after the SWAT team had entered the Seamans' residence, the apartment complex maintenance supervisor, Mark Meuschke, asked one of the Defendants outside what was going on. The officer stated they were looking for a murder suspect. Meuschke informed him that (1) they had made a mistake because it was not

Mr. or Mrs. Seaman; (2) Defendants must be in the wrong apartment; (3) Mr. Seaman is an elderly gentleman; and (4) the Seamans had just moved into apartment C-7 three to four weeks earlier. The officer told Meuschke to let them do their job and walked back inside the Seamans' apartment.

Mrs. Seaman asked Defendants to help her husband up from the floor, where he lay on his side, crying. She told Defendants that her husband had a heart condition and other medical problems. One Defendant pulled Mr. Seaman up hard off the ground by his handcuffed wrists, causing him to scream in pain.

Mr. Seaman then learned that Defendants were the police. As his wife had done, he, too, told them that they had made a mistake and that they must be in the wrong apartment. Defendants did not answer. They moved Mr. Seaman, who was still in handcuffs, crying and shaking uncontrollably, to a chair.

Mrs. Seaman told Defendants to check their identification. Defendants then identified the occupants as Mr. and Mrs. Seaman. Mrs. Seaman also told Defendants that they had their name on the apartment mailbox.

At approximately 10:10 A.M., one of the Defendants went to ask the apartment manager who had lived in apartment C-7 before the Seamans. The apartment manager gave the defendant the name of the prior tenant, who had lived there for two years.

Pierce County Detective Todd Karr, the officer in charge of the investigation, determined that the Seamans had not been involved in the shooting incident. Nonetheless, the investigation continued and the Seamans remained in handcuffs for the next two and one-half hours.

Defendants asked the Seamans whether they knew anyone, or their whereabouts, from a list of several Hispanic names. Mr. Seaman responded that their names were Mr. and Mrs. Seaman and that he knew none of the people on the officers' list. Again, the Seamans explained that they had just moved into the apartment and that the Defendants

must be in the wrong apartment. Again, they asked Defendants to check with the apartment manager and other tenants, to check the name on the mailbox, and to check their identification.

The Defendants ignored the Seamans' assertions that they had made a mistake. Instead, Defendants (1) accused the Seamans of being involved with the murder, (2) told them that they would not be released because they were murder suspects, (3) said they knew the Seamans had the information they wanted, and (4) told the Seamans that they were going to jail on murder charges unless they cooperated.

Mr. Seaman told Defendants repeatedly that they had made a mistake and that he did not know the people they were looking for. He asked Defendants to remove or to loosen the handcuffs, to let them go, to stop going through their residence and personal effects, and to summon medical attention because his leg, shoulder, knees, and wrists hurt. The parties dispute whether the city offered medical aid.[3]

Defendants then asked if there were any firearms in the residence. Mr. Seaman stated they had a handgun for home protection and told them where it was. Defendants retrieved the handgun and discovered that it had not been fired.

Several other tenants and apartment employees saw the Seamans through the window. Mrs. Seaman was still in handcuffs and crying. Maintenance worker Kenneth Gordon saw some Defendants leave the Seamans' residence at approximately 10:30 A.M. At approximately 11:00 A.M., Gordon informed a female defendant that they had made a mistake, that the Seamans had just moved into their residence 30 days ago, and that they were a nice elderly couple. The Defendant responded that it would be looked into. According to Gordon, another hour passed before

---

[3] Defendants assert that they offered the Seamans medical attention, but the Seamans had refused. The Seamans assert that Mr. Seaman asked for medical attention and Defendants denied his request.

Defendants finally left the Seamans' residence sometime around noon.

At approximately noon, Defendants told the Seamans that there had been a "mistake," and Detective Tim Kobel removed the handcuffs.[4] The Seamans again asked Defendants to leave their residence. But Defendants refused, said they were not finished, continued searching the residence, rummaged through the Seamans' personal effects, and, despite Mr. Seaman's telling them he had a key, broke into a storage locker.

Defendants photographed Mr. Seaman's injuries and the damage to the apartment. Defendants explained to the Seamans and the apartment manager how to seek reimbursement for the damage. Defendants asked the manager to help clean up the apartment.

Around 12:30 P.M., Defendants left the Seamans' residence. The Seamans were shaken and in shock. Mrs. Seaman was having difficulty speaking and appeared nervous; her wrists were red and exhibited cuff marks. Mr. Seaman was limping; his leg and right wrist were swollen, and his left knee was sprained and abraded.

III. SUMMARY JUDGMENT

The Seamans sued the Pierce County Sheriff's Department, the Lakewood Police Department, the Tacoma Police Department, and various individual officers, including Jack Nasworthy and Jane McCarthy, for violation of 42 U.S.C. § 1983 (unreasonable detention and excessive force in violation of the Fourth Amendment)[5] and intentional infliction of emotional distress when they mistakenly executed a search warrant at their residence.

---

[4] It is disputed how long the Seamans were in handcuffs. The Seamans state that it was two hours. Defendants claim that it was less than 40 minutes. The apartment manager stated that Defendants left the Seamans' apartment at 12:30 P.M. The apartment maintenance worker stated that he informed the city at 11:00 A.M. that the city had made a mistake, and that Defendants left the apartment at 12:00 P.M.

[5] See Liston v. County of Riverside, 120 F.3d 965, 977, 979 (9th Cir. 1997).

Defendants moved for summary judgment, arguing that (1) they had not violated the Seamans' Fourth Amendment rights because they had executed the search with a facially valid warrant, (2) the Seamans' detention was not prolonged or unreasonable and the force was not excessive, (3) they were entitled to qualified immunity, and (4) their acts were not outrageous and did not constitute intentional or reckless infliction of emotional distress. Defendants also moved to dismiss the claims against those officers who had not been present inside the Seamans' apartment during execution of the warrant, namely McCarthy, Nasworthy, Ron Tennyson, and Edward Wade. The Seamans did not object to dismissing Officers Tennyson and Wade.

The trial court granted Defendants' motion for summary judgment and dismissed all the Seamans' claims. The Seamans appeal.

## ANALYSIS

### I. Standard of Review

■ In reviewing a grant of summary judgment, we engage in the same inquiry as the trial court. *Degel v. Majestic Mobile Manor, Inc.*, 129 Wn.2d 43, 48, 914 P.2d 728 (1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c).

■■ The party seeking summary judgment bears "the initial burden of showing the absence of an issue of material fact." *Green v. A.P.C.*, 136 Wn.2d 87, 100, 960 P.2d 912 (1998). Once that burden has been met, the "adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in [CR 56], must set forth specific facts showing that there is a genuine issue for trial." CR 56(e).

Claims of qualified immunity under state law are subject to the summary judgment standard, which requires that all facts and inferences be construed most favorably to the nonmoving party. CR 56; *Bremerton Pub. Safety Ass'n v. City of Bremerton*, 104 Wn. App. 226, 230, 15 P.3d 688 (2001). Thus, in reviewing Defendants' claims of qualified immunity, we assume that all facts alleged in the Seamans' complaint are true. *See Kalina v. Fletcher*, 522 U.S. 118, 122, 118 S. Ct. 502, 139 L. Ed. 2d 471 (1997); *Gomez v. Toledo*, 446 U.S. 635, 637 n.3, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980).

▇ We examine this case to determine whether there are material issues of fact that require a trial and whether reasonable minds could reach only one conclusion from all the evidence. *See Our Lady of Lourdes Hosp. v. Franklin County*, 120 Wn.2d 439, 452, 842 P.2d 956 (1993).

## II. DISMISSAL OF OFFICERS MCCARTHY AND NASWORTHY

The Seamans do not contest the trial court's dismissal of officers McCarthy and Nasworthy, whom they concede were not inside the Seamans' residence. Therefore, we affirm the trial court's grant of summary judgment dismissal of this action against officers McCarthy and Nasworthy.

## III. QUALIFIED IMMUNITY

As confirmed by their counsel during oral argument, the Seamans do not claim (1) that Defendants used excessive force in entering their home under authority of the search warrant, or (2) that Defendants' initial detention of the Seamans was unreasonable upon entering to execute the warrant. Rather, they contend that their continued detention became unreasonable *later*, after Defendants had reason to believe that they had made a mistake and that they were detaining the wrong people.

▇ Determining whether Defendants are entitled to qualified immunity involves a three-step inquiry: (1) What

specific right did Defendants allegedly violate? (2) Was that right " 'so "clearly established" as to alert a reasonable officer to its constitutional parameters?' " (3) If so, would a reasonable officer have believed that his conduct was lawful? *DeBoer v. Pennington*, 206 F.3d 857, 864 (9th Cir. 2000) (quoting *Kelley v. Borg*, 60 F.3d 664, 666 (9th Cir. 1995)).

## A. UNREASONABLE DETENTION

### 1. Specific Right Violated

■ "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999). "In identifying the contours of the right we must strike a balance 'between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties.'" *DeBoer*, 206 F.3d at 864 (quoting *Davis v. Scherer*, 468 U.S. 183, 195, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984)). The plaintiff's allegations are crucial to "identify[ing] the contours of the right allegedly violated." *DeBoer*, 206 F.3d at 864.

■ Here, the specific right that Defendants allegedly violated derives from the Fourth Amendment's prohibition of unreasonable police detentions of home occupants during execution of a search warrant. *See Michigan v. Summers*, 452 U.S. 692, 705, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981).

### 2. Clearly Established Law

■ To determine whether a federal right is clearly established, we look first to United States Supreme Court precedent and then to decisions of the controlling Circuit Court of Appeals. *See Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). For qualified immunity purposes, "clearly established" means:

> "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing

violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

*Wilson*, 526 U.S. at 614-15 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).

■ The Supreme Court has held: "[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 U.S. at 705 (footnote omitted).[6] Here, the Seamans were handcuffed during a substantial portion of their two-hour detention on the premises being searched. This police action implicated a clearly established Fourth Amendment right.

### 3. Objective Reasonableness of Defendants' Conduct

■ The Fourth Amendment proscribes "unreasonable" searches and seizures. The Supreme Court has reasoned that generally, the minor intrusiveness of detaining a resident in his or her home during execution of a warrant is outweighed by law enforcement interests in (1) preventing flight if incriminating evidence is found, (2) minimizing the risk of harm to the officers and occupants during the search, and (3) conducting an orderly search with the resident's help in unlocking doors and containers. *Summers*, 452 U.S. at 701-03. But "[a] detention conducted in connection with a search may be unreasonable if it is unnecessarily . . . prolonged, or if it involves an undue invasion of privacy." *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994).

■ The reasonableness of a search or a seizure depends not only on when it is made, but also on how it is carried

---

[6] *See also Heitschmidt v. City of Houston*, 161 F.3d 834 (5th Cir. 1998) (detention unreasonable where resident of house that was not part of illegal activity was held in handcuffs for four hours during a search of house with valid warrant).

out. "[E]ven when supported by probable cause, a search or seizure may be invalid if carried out in an unreasonable fashion." *Franklin*, 31 F.3d at 875. "Whether an otherwise valid search or seizure was carried out in an unreasonable manner is determined under an objective test, on the basis of the facts and circumstances confronting the officers." *Franklin*, 31 F.3d at 875.

Here, the Seamans have established a prima facie case that Defendants detained them far longer than necessary to determine whether they had any knowledge or connection with the shooting. Defendants kept the Seamans handcuffed long after they had reason to believe that the Seamans were not connected to the people they were seeking. The Seamans agree that Defendants acted reasonably in briefly detaining them during the initial phase of the search warrant execution. They argue, however, that their detention became unreasonable after (1) Defendants observed that the Seamans did not at all match the description of the people believed to have been involved in the shooting, (2) the Seamans and other apartment complex personnel told Defendants that they had the wrong people, and (3) Defendants themselves acknowledged that there had been a mistake.

"Qualified immunity may shield officials who conduct an unreasonable . . . seizure which violates an individual's rights if a reasonable person in the position of the official could have believed that her conduct was lawful." *DeBoer*, 206 F.3d at 866-67. But here, there is a question of material fact concerning the reasonableness of Defendants' detention of the Seamans and whether a reasonable officer could have believed that his conduct was lawful. *See DeBoer*, 206 F.3d at 864. Accordingly, Defendants were not entitled to qualified immunity as a matter of law under these facts, and the trial court erred in dismissing the Seamans' claim of unlawful detention on summary judgment.

## B. Excessive Force

The Seamans also allege a cause of action under 42 U.S.C. § 1983, claiming that Defendants used excessive force in handcuffing and pointing machine guns at them. Defendants counter that their actions were normal procedure.

██ The Supreme Court has held that claims of excessive force in the course of making an arrest are properly analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). The same standard applies when analyzing claims of excessive force in executing a search warrant. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, not 20/20 hindsight. It is a standard of the moment as police officers are often forced to make split-second judgments in tense, uncertain, and rapidly evolving circumstances. *See Graham*, 490 U.S. at 397; *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

In *Graham*, the Supreme Court listed facts and circumstances that a court should consider when applying the "test of reasonableness": (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

██ Here, as the Seamans concede, Defendants were initially entitled to use force to detain them, including handcuffs, in light of the murder they were investigating and the risk to officer safety that Defendants expected to encounter from the persons they sought in the residence. Thus, notwithstanding the Seamans' discomfort, Defendants' initial use of force was "objectively reasonable" as a

matter of law.[7] *See Sintra, Inc. v. City of Seattle*, 119 Wn.2d 1, 26, 829 P.2d 765 (1992) ("objective reasonableness" is test for qualified immunity for public employees).

Accordingly, we agree with the trial court that Defendants are entitled to qualified immunity and dismissal of the excessive use of force claim. *See Siegert v. Gilley*, 500 U.S. 226, 232, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991).

## C. EMOTIONAL DISTRESS

■■■ To state a claim for the tort of outrage or intentional infliction of emotional distress, a plaintiff must show " ' "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress." ' " *Birklid v. Boeing Co.*, 127 Wn.2d 853, 867, 904 P.2d 278 (1995) (quoting *Dicomes v. State*, 113 Wn.2d 612, 630, 782 P.2d 1002 (1989) (quoting *Rice v. Janovich*, 109 Wn.2d 48, 61, 742 P.2d 1230 (1987))).

> "The conduct in question must be '*so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community*.' "

*Birklid*, 127 Wn.2d at 867 (quoting *Dicomes*, 113 Wn.2d at 630 (quoting *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975))).

■■■ Whether conduct is sufficiently outrageous is ordinarily a question for the jury. Initially, however, it is the trial court's responsibility to determine if reasonable minds could differ about whether the conduct was so extreme as to result in liability. *Dicomes*, 113 Wn.2d at 630; *Jackson v. Peoples Fed. Credit Union*, 25 Wn. App. 81, 84, 604 P.2d 1025 (1979) (trial court must make an initial determination as to whether the conduct may reasonably be regarded as

---

[7] As we have explained in the previous section, it was the *length* of the detention and discomfort from the length of time the Seamans remained handcuffed that remain actionable.

extreme and outrageous, thus warranting a factual determination by the jury).

In determining whether a case should go to a jury, a trial court considers: (a) the position the defendants occupied; (b) whether the plaintiff was peculiarly susceptible to emotional distress, and if the defendants knew this fact; (c) whether the defendants' conduct may have been privileged under the circumstances; (d) whether the degree of emotional distress the defendants caused was severe as opposed to merely annoying, inconvenient, or embarrassing to a degree normally occurring in a confrontation between these parties; and (e) whether the defendants were aware that there was a high probability that their conduct would cause severe emotional distress, and they consciously disregarded it. *Phillips v. Hardwick*, 29 Wn. App. 382, 388, 628 P.2d 506 (1981) (citing *Jackson*, 25 Wn. App. at 86-87).

In reviewing the summary judgment dismissal of their emotional distress claims, we take the facts in the light most favorable to the Seamans. *Bremerton Pub. Safety Ass'n*, 104 Wn. App. at 230. Accepting the Seamans' factual allegations as true and drawing all reasonable inferences from them in their favor, we conclude that (1) there are material issues of fact that require a trial, (2) reasonable minds could differ as to whether the Defendants' conduct was " ' "*so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.*" ' " *Birklid*, 127 Wn.2d at 867 (quoting *Dicomes*, 113 Wn.2d at 630 (quoting *Grimsby*, 85 Wn.2d at 59)).

Defendants were lawfully engaged in the investigation of a serious crime. They had a warrant. The residents of apartment C-7 were suspects. Although the Seamans do not challenge Defendants' entry and initial use of force to contain them, they have proffered sufficient facts to convince a trier of fact that thereafter (1) Defendants' conduct extremely distressed them, (2) Defendants were aware or should have been aware that the Seamans were particu-

larly susceptible to emotional distress, and/or (3) Defendants consciously disregarded an obvious, high probability that their conduct would cause the Seamans to suffer severe emotional distress.

Elderly Mr. Seaman was quaking, crying, and begging Defendants not to hurt them. Mrs. Seaman repeatedly tried to explain to Defendants about his medical condition and asked for help, which the Seamans claim Defendants rebuffed. The Seamans allege that Defendants used especially rough force, beyond the simple act of handcuffing them—yanking them by the cuffs up and down, throwing them down on the floor or bed, leaving the tight and painful cuffs on for long periods of time to the point that they caused bruises, and ignoring the Seamans' repeated pleas to check with the apartment manager about their identity because Defendants clearly had the wrong people. And even after there was substantial doubt that the Seamans were the people Defendants were seeking, Defendants nevertheless (1) accused the Seamans of being involved with the murder, (2) told them that they would not be released because they were murder suspects, (3) said they knew the Seamans had the information they wanted, (4) told the Seamans that they were going to jail on murder charges unless they cooperated, and (5) continued rummaging through the Seamans' personal effects, leaving the apartment in shambles.

The Seamans have produced sufficient evidence such that a trier of fact could find Defendants' conduct exceeded "*all possible bounds of decency*," measured against an objective standard of reasonableness. *Dicomes*, 113 Wn.2d at 630. Therefore, we reverse the trial court's summary judgment dismissal of the Seamans' emotional distress claims.

We affirm the summary judgment dismissal of all claims against defendants McCarthy and Nasworthy. With respect to the remaining Defendants, we reverse and remand for trial on the unlawful detention and intentional infliction of emotional distress claims, and we affirm summary judg-

ment dismissal of the other claims, including excessive force.

SEINFELD and BRIDGEWATER, JJ., concur.