[No. 39797-8-II. Division Two. November 9, 2011.]

KRISTA OSBORNE, *Respondent*, v. TOM SEYMOUR, *Appellant*.

822

*Catherine Wright Smith* and *Howard M. Goodfriend* (of *Smith Goodfriend PS*); and *Mark E. Lindquist, Prosecuting Attorney for Pierce County*, and *Ronald L. Williams, Deputy*, for appellant.

*Fred Diamondstone* (of *Law Offices of Fred Diamondstone*) and *Darrell L. Cochran* (of *Pfau Cochran Vertetis Amala PLLC*), for respondent.

¶1 Hunt, J. — Tom Seymour appeals the trial court's (1) grant of partial summary judgment to Krista Osborne, holding him liable for violating her Fourth Amendment rights under 42 U.S.C. § 1983; (2) denial of his cross motion and all defendants' summary judgment motion to dismiss Osborne's § 1983 claim against him, based on qualified immunity; and (3) award of attorney fees and costs of

$340,654.14 against him. We affirm the trial court's summary judgment rulings. We vacate the trial court's award of attorney fees and costs and remand to the trial court to reduce the award to include the attorney fees and costs attributable only to Osborne's litigation of her § 1983 claim against Seymour. We also deny Osborne's request for attorney fees on appeal.

## FACTS

### I. 42 U.S.C. § 1983 AND FOURTH AMENDMENT VIOLATIONS

#### A. Restraining Orders

¶2 On July 25, 2004, Krista Osborne obtained an emergency temporary protection order against her then-husband, Lloyd Bird, prohibiting him from entering their residence. This protection order specifically stated:

> [I]t is hereby ORDERED . . . that the Respondent [Bird] is RESTRAINED from:
>
> > [A]ssaulting, harassing, or contacting the petitioner [Osborne] in any manner.
> >
> > Going upon the premises of the petitioner's residence or workplace.
>
> . . . .
>
> WARNING: VIOLATION OF THE PROVISIONS OF THIS ORDER WITH ACTUAL NOTICE OF ITS TERMS IS A CRIMINAL OFFENSE. . . . ONLY THE COURT CAN CHANGE THE ORDER UPON WRITTEN APPLICATION.

Clerk's Papers (CP) at 1046. This order was effective until August 6, 2004.

¶3 Also on July 25, the Pierce County Sheriff's Department (PCSD) suspended Bird, who was a detective assigned

to the Domestic Violence Unit (DVU).[1] When notifying Bird about this emergency suspension, his supervisor, Sergeant Prentiss Hunsinger, told Bird: "A temporary protection order is in place. Don't come back to the residence." CP at 779.

¶4 The next day, July 26, PCSD Sergeant Thomas E. Seymour, a "supervisor of the Domestic Violence Unit," "was . . . advised of the situation" "as part of protocol" for "domestics involving other law enforcement officers including law enforcement officers within [the domestic violence] department." CP at 132. Around 2:00 PM that same day, Seymour served Bird with Osborne's restraining order against him and told Bird that the "order provided that [he (Bird)] w[asn't] supposed to go to [the residence]" and "that [he] w[asn't] supposed to have any contact with [Osborne]." CP at 781.

¶5 Later that same day, Bird obtained a protection order against Osborne. In his petition, he requested "possession of essential personal belongings," including "[a] Harley Davidson, Yamaha motorcycles . . . [,] clothing [and] essential items"; but he did not mark the boxes on the petition asking "the court [to] order the appropriate law enforcement agency to assist [him] in obtaining" "[p]ossession of [his] essential personal belongings" at "the shared residence." CP at 1051. A superior court commissioner signed Bird's protection order against Osborne; but, like Bird's petition, this form order did not have marks in the boxes that would have permitted law enforcement agencies to assist Bird in obtaining his belongings. Nor did this order list under the heading "Petitioner [Bird] shall have possession of essential personal belongings" any specific items that Bird had noted in his petition, such as his Harley Davidson, Yahama motorcycle, and clothing. CP at 1055. Approximately one hour after the commissioner signed Bird's protection order,

---

[1] "The Domestic Violence Unit includes the clerk's office; the prosecutor's office; the victim advocates of the prosecutor; and law enforcement, particularly Pierce County Sheriff's Department," which are all "housed" "in [one] unit." CP at 827.

Seymour drove to Osborne's residence and served her with it. While there, Seymour took possession of several of Bird's handguns, his "commission card," his "wallet badge," and his "access card."[2] CP at 102.

¶6 The next day, July 27, Bird was in Seymour's office filling out paperwork to correct a "clerical error" in the temporary residential address noted in his restraining order against Osborne. CP at 140. The same superior court commissioner signed this modification order. CP at 110. Like the other two orders already in place, this modification order did not authorize law enforcement officers to assist Bird with taking possession of his personal property from Osborne's residence. On the contrary, this modification order stated only that the July 26 order "shall be . . . continued in effect," notwithstanding the correction of Bird's residential address. CP at 140. When Seymour served Osborne with this modification order, Seymour did not mention any plan to recover Bird's other possessions from the family home.

## B. Unauthorized Physical Entry into Osborne's Home

¶7 Also on July 27, Bird told Seymour, "I need to get my clothing, and I don't have anything other than what I'm wearing," and "I need to get a civil standby or something to get my clothing out of there." CP at 796 (internal quotation marks omitted). Seymour then "quer[ied]" former DVU clerk's office employee Sarah Schaub about "her opinion on a civil standby."[3] CP at 115. Although the parties dispute the contents of this conversation, Seymour concedes that

---

[2] Osborne did not claim at trial, nor does she claim on appeal, that Seymour's actions during this initial July 26 encounter were unlawful or unconstitutional.

[3] The parties do not provide a definition of a "civil standby," but a Texas appellate decision cites the testimony of a police officer explaining, "[A] civil standby is when an officer is basically called to come out basically to make sure there is no breach of the peace." *Harris County v. Hinojosa*, 294 S.W.3d 737, 741 (Tex. App. 2009) (internal quotation marks omitted); *accord Beal v. City of Seattle*, 134 Wn.2d 769, 773-74, 954 P.2d 237 (1998).

Schaub did not provide any legal opinion on the lawfulness of a civil standby.

¶8 Bird also called Sergeant William Wells Cassio and asked "to meet him in University Place over a civil standby." CP at 811. When they met, Bird explained to Cassio that he "had a protection order" and that "he was requesting a civil standby for that protection order so he could return to his residence"; and Bird "specifically asked [Cassio] if [he, Bird] could retrieve his Harley Davidson." CP at 812. Cassio reviewed both Bird's protection order against Osborne and Osborne's protection order against Bird. Cassio "didn't see the authority for this civil standby that [Bird] was asking for," concluded that there was "no authority" for Bird to retrieve his motorcycle, and "told [Bird] that [he, Cassio] wouldn't be assisting in [Bird's] civil standby." CP at 812-14.

¶9 The next day, July 28, at 1:40 PM, Bird and Jenna Bird,[4] his daughter from another relationship, met the following persons at the University Place police station: (1) Seymour; (2) PCSD Sergeant Gregory Dean Stonack, the "sergeant on duty" and the "supervisor of the City of University Place," who "[wa]s very personal friends with . . . Bird," CP at 134, 186; and (3) PCSD Deputy Peter Anthony Aloisio, whom Stonack supervised. The apparent purpose of this meeting was to congregate the participants in the plan to retrieve Bird's belongings.

¶10 According to Stonack, at the University Place police station meeting, Seymour (1) said that "the brass was aware that the [Pierce County Sheriff's] department was going to be doing a civil standby at the Bird residence," CP at 926; and (2) "indicate[d]" that Osborne's order against Bird "allowed Lloyd Bird to be accompanied by the sheriff's

---

[4] During the first week of July 2004, Jenna Bird moved out of Osborne's residence and into her (Jenna Bird's) mother's residence. At the time of the events at issue here (July 25-28, 2004), Jenna Bird had not lived in Osborne's residence for "almost three weeks." CP at 260. For the remainder of this opinion we refer to Jenna Bird by her first name only to avoid confusion with Lloyd Bird. We intend no disrespect.

department and retrieve his personal effects." CP at 928. Seymour did not, however, read the protection orders.

¶11 Nor did Seymour later contact his superiors or other law enforcement officers in the DVU to ask "whether [they thought] it was appropriate to do a civil standby for Lloyd Bird." CP at 122. Despite the plan for law enforcement to accompany Bird to Osborne's home to retrieve Bird's personal belongings and the meeting at the University Place police station that afternoon, Seymour did not contact Osborne to inform her about the impending plan.

¶12 En route to Osborne's residence, Seymour called Craig S. Adams, a Pierce County deputy prosecuting attorney and the Pierce County Sheriff's legal advisor. Seymour "advise[d] [Adams] that [he, Seymour] w[as] going to do a civil standby for . . . Bird" at Osborne's residence. CP at 125. But "because [he, Seymour, was] comfortable doing the civil standby"[5] and had not read the restraining orders himself, he (1) failed to tell Adams that the restraining orders in place did not give explicit permission for a civil standby; (2) did not tell Adams that Osborne's restraining order prohibited Bird from coming to her residence; and (3) did not ask Adams to review "the [restraining] orders to determine whether"[6] retrieving Bird's personal possessions was legal.

¶13 Seymour did, however, ask Adams "to clarify whether or not [Bird] c[ould] take [his motorcycle]" because "[law enforcement] d[oesn't] move motorcycles or real property" during civil standbys. CP at 835-36. According to Seymour, Adams told him that "as long as [the motorcycle is] not disputed property, [he, Bird, could] take his motorcycle." CP at 837. Nevertheless, Adams did not "authorize[ ] Lloyd Bird to enter" Osborne's residence, nor did Adams "advise Sergeant Seymour to disregard the terms of any of the court orders." CP at 877.

---

[5] CP at 835.

[6] CP at 125.

¶14 Seymour was the "lead," "commanding," or "primary" officer during the "civil standby" with Bird at Osborne's home. CP at 158, 162, 256. Seymour and Aloisio knocked on Osborne's door, but no one answered. When Aloisio realized that Osborne was not home, he "asked [Seymour] to make it stop," "point[ing] out to Sergeant Seymour that [Seymour, Stonack, and Aloisio] were not following what [he, Aloisio,] thought to be procedure." CP at 165, 188. Seymour responded that he had an "order" that gave "[Bird] the right to enter the property and get his stuff" and that he (Seymour) "would just make a list" of items that Bird was taking. CP at 166, 190.

¶15 Bird opened the garage door with an electric garage door opener. Parked inside the garage was a pickup truck that Osborne had loaded with "tons of [Bird's] personal items." CP at 129. Bird, Jenna, Seymour, and Aloisio entered the residence. Bird and Jenna went upstairs and "remov[ed] items." CP at 158. Seymour, who spent most of the time inside the house "downstairs by the garage or by the dining area," also went upstairs at one point. CP at 158. Bird took the pickup truck, a Harley Davidson motorcycle, and television sets. Seymour asked Aloisio for a camera because "there w[ere] too many items going out to make a list so [he, Seymour,] would just take pictures of it." CP at 166. The photos, however, were only "of the back of the truck with a bunch of bags." CP at 166.

¶16 Stonack stayed in his car. At least once, Aloisio "went out to Sergeant Stonack's car and . . . told [Stonack] that [he, Aloisio,] objected and that [he, Aloisio,] didn't think [Seymour, Stonack, and Aloisio] were following policy." CP at 166. In response, Stonack told Aloisio that "it was Sergeant Seymour's call." CP at 191.

¶17 Around 5:00 PM that day, Osborne returned to her residence and discovered evidence of the earlier activity. Inside the house, Osborne found Seymour's business card listing Seymour as " 'domestic violence unit supervisor' " and containing a handwritten note on the back of the card

reading, " 'I was here with Lloyd [Bird] on a civil stand-by.' "
5 Verbatim Report of Proceedings (VRP) at 744 (internal
quotation marks omitted). She discovered that in addition
to his personal possessions, Bird had taken some of her
"own personal clothing . . . , cameras, flashlights, . . .
personal toiletries," and "historical paperwork from when
[she had] worked at [the] Pierce County Sheriff's Depart-
ment." CP at 222-23.

## II. PROCEDURE

¶18 On July 14, 2006, Osborne sued Bird, Jenna, Sey-
mour, Stonack, Pierce County Sheriff Paul Pastor, Pierce
County, and Brendan Harding Phillips.[7] CP at 15-16.
Osborne's complaint included: (1) an assault claim against
Bird; (2) an assault claim against Jenna;[8] (3) a tortious
interference of employment claim against Bird; and (4) 42
U.S.C. § 1983[9] claims against Pastor, Seymour, Stonack, and
Pierce County for "violation of her civil rights to equal
protection of the laws and to be free from violations of
constitutional rights under the Fourth, Ninth and Four-
teenth Amendments to the United States Constitution." CP
at 20.

---

[7] Her amended complaint dated April 20, 2009, included an intentional inflic-
tion of emotional distress claim against Phillips, alleging that he "broke into [her]
residence," "acting as an agent of Defendants Lloyd Bird and Jenna Bird and . . .
that [a] yet to be identified Pierce County Sheriff's deput[y] deliberately lost . . .
Phillips['] identification and other property for the purpose of reducing the
likelihood that Phillips would be criminally charged." CP at 293-94. Osborne's
allegations against Phillips, however, are not relevant to this appeal.

[8] In Osborne's initial complaint, filed July 14, 2006, Osborne alleged that Jenna
had "attempted to enter [Osborne's] residence" on July 29 and, "[w]hen [Osborne]
sought to block her entry by blocking the door, [Jenna] continued to shove and
force the door into [Osborne] and caused a laceration and bruising to [Osborne's]
foot in the process." CP at 18. Osborne's claims against Jenna also are irrelevant
to this appeal.

[9] 42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or
usage, of any State . . . subjects, or causes to be subjected, any citizen of the
United States . . . to the deprivation of any rights, privileges, or immunities
secured by the Constitution and laws, shall be liable to the party injured in an
action at law, suit in equity, or other proper proceeding for redress.

## A. Summary Judgment Motions

¶19 Osborne moved for partial summary judgment against Seymour, seeking to establish his liability under 42 U.S.C. § 1983. Seymour cross-moved for summary judgment, seeking to dismiss Osborne's § 1983 claim on the basis of qualified immunity. Pierce County, Pastor, Seymour, and Stonack (Pierce County Defendants) also moved for summary judgment, arguing that "[Osborne] ha[d] no evidence" supporting her claim that they had violated her equal protection rights by "pervert[ing] the internal affairs process and otherwise . . . not treat[ing] [her] complaints appropriately."[10] CP at 1119 (internal quotation marks omitted).

### 1. Osborne's partial summary judgment motion

¶20 Osborne sought partial summary judgment to establish Seymour's liability for "violat[ing] [her] constitutional rights by unlawfully entering her house on July 28, 2004, and enabl[ing] the unlawful entry of her estranged husband, Lloyd Bird." CP at 48. Osborne further alleged:

> Defendant Seymour took it upon himself to organize the civil standby on behalf of Lloyd Bird. Defendant Seymour understood that his entry into [the] home on July 28, 2004[,] implicated Plaintiff Krista Osborne's Fourth Amendment rights. Defendant Seymour did not have a search warrant allowing him to enter [the] home on July 28, 2004. Defendant Seymour did not have a court order that allowed him or Lloyd Bird to access the house. Defendant Seymour was not investigating a crime when he entered [the] home on July 28, 2004. Defendant Seymour had no belief that lives were endangered when he entered the home on July 28, 2004. Seymour's entry

---

[10] The motion also asked the trial court to grant summary judgment dismissal of the Pierce County Defendants. But we need not resolve the merits of the Pierce County Defendants' arguments because only Seymour is before us in this appeal.

into Ms. Osborne's home was illegal. Summary judgment against Defendant Tom Seymour should be entered now.

CP at 57 (footnotes and citations omitted).

¶21 Osborne argued that (1) acting "under the color of state law,"[11] Seymour had violated her "Fourth Amendment right to be free from unreasonable government intrusion into her home"[12]; (2) Seymour had unlawfully entered her home in that she "was not aware of and did not give her consent to the so-called 'civil standby' "[13]; (3) Seymour had infringed on her Fourth Amendment rights by " 'affirmatively facilitat[ing] or encourag[ing],' an unreasonable search and seizure performed by [Bird,] a private person"[14]; (4) the transgressed rights "w[ere] clearly established," which could preclude Seymour's entitlement to a qualified immunity defense because "[i]n this case, a reasonable officer would have known that entry into the home without a search warrant and in disobedience of an expressed court order on July 28, 2004, violated the clearly established Fourth Amendment rights of Plaintiff Krista Osborne"[15]; (5) nothing in her July 25, 2004 protective order explicitly permitted Seymour to accompany Bird to Osborne's home; and (6) because "there is no issue of material fact as to whether [Seymour] is entitled to qualified immunity," the trial court should rule that Seymour was liable for violating her Fourth Amendment rights. CP at 76.

¶22 The trial court granted Osborne's partial summary judgment motion, ruling, "Seymour is found to have violated [Osborne's] Fourth Amendment Right[s] to be free from unreasonable search and seizure at her residence on

---

[11] CP at 60.

[12] CP at 65.

[13] CP at 61-62.

[14] CP at 65 (quoting *Kalmas v. Wagner*, 133 Wn.2d 210, 218, 943 P.2d 1369 (1997)).

[15] CP at 70-71.

July 28, 2004[,] by entering the residence and enabling Lloyd Bird to enter the residence." CP at 262.

### 2. Seymour's cross motion for summary judgment

¶23 Seymour did not dispute Osborne's facts. Instead, he argued that these facts did not amount to a violation of her constitutional rights. For example, Seymour contended that (1) "[t]he entry of [Osborne's] home was not a 'search,' but rather a civil standby conducted with police escort of the co-owner of the house going to get his belongings"[16]; (2) "civil standbys . . . are commonly allowed under these circumstances"[17]; and (3) "it cannot be said that [Osborne's] reasonable expectations of privacy were breached"[18] by the civil standby or "that it was clearly established that a civil standby under the very unique set of circumstances which were present herein constituted a violation of Ms. Osborne's constitutional rights." CP at 217.

¶24 Then Seymour further argued that "[e]ven if the court were to conclude that a violation did occur,"[19] he was entitled to qualified immunity because "[he] fully believed that he was acting reasonably per his experience and through consultation with several others in participating in a civil standby" and "[t]here was no intention on his part to violate Ms. Osborne's constitutional rights." CP at 215.

¶25 Osborne replied that (1) Seymour had not engaged in a "civil standby" because her protection order against Bird did not provide for one; and (2) Seymour's failure to read the protection orders did not entitle him to qualified immunity: "A Pierce County sergeant—especially one who is the supervisor of the domestic violence unit—must act in an objectively reasonable fashion and read the terms of the

[16] CP at 212.

[17] CP at 213.

[18] CP at 214.

[19] CP at 217.

order or warrant that he is executing. Qualified immunity is not available to Sgt. Seymour." CP at 236.

¶26 The trial court denied Seymour's cross motion for summary judgment, ruling that "[Osborne's] Fourth Amendment Rights were clearly established such that it would have been clear to a reasonable officer that his conduct was unlawful in the situation that Sgt. Tom Seymour faced on July 28, 2004," and, therefore, Seymour was not entitled to qualified immunity from Osborne's lawsuit. CP at 262.

### 3. Pierce County Defendants' summary judgment motion

¶27 Pierce County Defendants argued that (1) Seymour did not violate Osborne's constitutional rights because no search took place at her home; (2) rather, Bird, "the co-owner" of the home, simply "enter[ed] his own home to retrieve his personal belongings," "accompanied by law enforcement officers to do a civil standby as is commonly allowed by law"[20]; (3) "civil standbys are often allowed regardless of whether an emergency protection order specifically provides for it or not"[21]; and (4) Seymour was entitled to qualified immunity.

¶28 Osborne responded that Seymour had "arranged for . . . Bird to violate the restraining orders," "facilitated . . . Bird's access to [Osborne's] computer, and allowed [Bird] to remove and re-arrange property at the residence, [in] violat[ion of] Osborne's privacy and her Fourth Amendment rights." CP at 904. Osborne also argued that Seymour could not invoke the " 'advice of counsel' " argument in support of his qualified immunity defense because he (Seymour) had given "incomplete and inaccurate disclosures" to Adams, the Pierce County Sheriff's legal advisor. CP at 911. In addition to reiterating their original arguments, Pierce County Defendants replied that "officers who

[20] CP at 1122.

[21] CP at 1123.

are present at a scene, and even those who enter a residence, as part of a community caretaking/peace keeping mission, do not violate a person's [Fourth] amendment rights." CP at 981.

¶29 The trial court granted in part and denied in part Pierce County Defendants' summary judgment motion, ruling that (1) "there [we]re no genuine issues of material fact with regard to [Osborne's Fourteenth] Amendment equal protection violation claim"[22]; and (2) "there [we]re genuine issues of material fact as to [Osborne's Fourth] Amendment unlawful search and seizure claims and that Pierce County Defendants are not entitled to summary judgment dismissal as a matter of law regarding those claims." CP at 1204.

## B. Trial

¶30 Before trial, Osborne dropped some defendants and claims[23] and added two new claims against Bird—"trespass upon land and the trespass to personal property" and "outrage related to [Bird's] stalking and harassing actions." CP at 337 Remaining for trial were (1) three named defendants—Bird, Seymour, and Pierce County; (2) Osborne's four claims against Bird—for assault, tortious interference with employment, trespass, and "outrage"[24]; and (3) and one claim each against Seymour and Pierce County for violating Osborne's civil rights under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.[25]

---

[22] CP at 1204.

[23] Osborne removed Jenna, Stonack, Pastor, and Phillips as named defendants. In so doing, she dropped her assault claim against Jenna, her intentional infliction of emotional distress claim against Phillips, and her constitutional violation claims against Stonack and Pastor.

[24] CP at 337.

[25] Osborne's § 1983 claim against Pierce County asserted two separate theories: (1) Seymour "acted pursuant to an expressly adopted official policy or longstanding practice or custom of [Pierce County]"; and (2) the training policies of Pierce County "were not adequate to train its deputies to handle the usual and

¶31 A jury found that Bird had committed trespass against Osborne and awarded $15,000 in damages for this claim. The jury also found that Bird did not tortiously interfere with Osborne's employment and that Bird did not engage in outrageous conduct.[26]

¶32 Because the trial court had previously ruled on summary judgment that Seymour had "acted under the color of law and violated [Osborne's] Fourth Amendment right to be secure in her home,"[27] the jury did not have to decide the issue of Seymour's liability at trial. Thus, verdict form 1 asked the jury only to assess the amount of compensatory damages that the trial court should award against Seymour for this constitutional violation, which the jury set at $2,500. Verdict form 1 also asked the jury to assess punitive damages if it "f[ound] that punitive damages should be awarded against Defendant Seymour for violation of the Fourth Amendment"; the jury awarded $15,000 in punitive damages. CP at 436.

¶33 The jury also found that the Pierce County Sheriff's Department had "fail[ed] to train . . . Seymour, to handle civil standbys" and "act[ed] with deliberate indifference to the obvious consequences of its failure to provide adequate training to Defendant Seymour." CP at 437. The jury did not find, however, that this "failure to train was the moving force that caused injury or damage to . . . Osborne." CP at 437. Nor did the jury find that Seymour, "in violating the Fourth Amendment, act[ed] in accordance with a longstanding custom, policy, or practice in the Pierce County Sheriff's Department." CP at 437. Accordingly, the jury did not award any compensatory damages against Pierce County.

---

recurring situations with which they must deal," and Pierce County "was deliberately indifferent to the obvious consequences of its failure to train its deputies adequately." CP at 407-08 (Jury Instructions 14, 15).

[26] Osborne apparently later "abandoned" her assault claim against Bird toward the end of trial. VRP (June 29, 2009) at 149-50.

[27] CP at 436.

## C. Judgment, Findings and Conclusions, and Appeal

¶34 On September 1, 2009, the trial court issued its "Order and Judgment," which (1) entered judgment against Seymour and Bird in the amounts of $17,500 and $15,000, respectively;[28] (2) awarded $284.40 in costs against Bird; (3) dismissed Osborne's claims against Pierce County with prejudice; and (4) reserved its ruling on attorney fees and costs as to Seymour. On September 24, Seymour appealed the trial court's September 1, 2009 "Order and Judgment." CP at 263.

¶35 On January 21, 2010, the trial court (1) entered extensive findings of fact and conclusions of law for attorney fees and costs, including a "lodestar calculation" analysis[29]; (2) concluded that Osborne was "the prevailing party" who "achieved substantial success with her recovery of compensatory and punitive damages"[30]; and (3) assessed $303,450.45 in attorney fees and $37,203.69 in costs against Seymour in Osborne's favor.

¶36 On February 22, Seymour amended his September 24, 2009 notice of appeal by adding three new issues for review: (1) the trial court's September 1, 2009 order imposing judgment of $17,500 against Seymour for violating Osborne's Fourth Amendment rights; (2) the trial court's January 21, 2010 "Findings of Facts and Conclusions of Law on Motion for Attorneys' Fees and Costs"; and (3) the trial court's February 17, 2010 "Supplemental Order and Judgment Against Defendant Tom Seymour for Attorney's Fees and Costs." CP at 1172.

---

[28] CP at 266.

[29] CP at 704.

[30] CP at 707-08 (Conclusions of Law 2, 5).

## ANALYSIS

### I. No Qualified Immunity

¶37 Seymour first argues that the trial court erred (1) by granting Osborne's partial summary judgment motion establishing his liability under 42 U.S.C. § 1983 for violating her Fourth Amendment rights; (2) by denying his summary judgment cross motion to establish his qualified immunity from Osborne's action; and (3) by denying Pierce County Defendants' summary judgment motion seeking to dismiss Osborne's § 1983 claim against him. Osborne contends that the trial court's summary judgment rulings were not erroneous because no reasonable officer could conclude that Seymour's actions were lawful. We agree with Osborne.

¶38 Seymour challenges the trial court's summary judgment rulings in Osborne's favor on two primary grounds: (1) Osborne's Fourth Amendment rights were "not clearly established"[31] at the time of Seymour's alleged constitutional violations because the law surrounding civil standbys is "neither clear nor settled"[32]; and (2) "even if Sgt. Seymour was not entitled to qualified immunity as a matter of law given the unsettled nature of the law governing civil standbys, the *reasonableness* of Sgt. Seymour's conduct was a question for the jury." Br. of Appellant at 30. These arguments fail.

### A. Standard of Review

¶39 When reviewing a summary judgment motion, we "must take the position of the trial court." *Ruff v. County of King*, 125 Wn.2d 697, 703, 887 P.2d 886 (1995). " 'The evidence before the judge is that contained in the pleadings, affidavits, admissions and other material properly pre-

---

[31] Br. of Appellant at 23.

[32] Br. of Appellant at 17.

sented.' " *Chase v. Daily Record, Inc.*, 83 Wn.2d 37, 42, 515 P.2d 154 (1973) (quoting *Leland v. Frogge*, 71 Wn.2d 197, 200, 427 P.2d 724 (1967)). "Summary judgment is proper if pleadings, depositions, affidavits, and admissions, viewed in a light most favorable to the nonmoving party, show there is no genuine issue of material fact and demonstrate that the party making the motion is entitled to judgment as a matter of law." *Bratton v. Welp*, 145 Wn.2d 572, 576, 39 P.3d 959 (2002).

¶40 "If a genuine issue of fact exists preventing a determination of qualified immunity at summary judgment, the case must proceed to trial." *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). A grant of summary judgment that rejects a qualified immunity defense is improper "if officers of reasonable competence could disagree" on the legality of the officer's action. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). But if "no reasonably competent officer would have concluded" that the action was lawful, then the trial court should not recognize immunity. *Malley*, 475 U.S. at 341. Such is the case here.

### B. Qualified Immunity

¶41 "Under the doctrine of qualified immunity, government officials who perform discretionary functions are usually shielded from liability for civil damages if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Musso-Escude v. Edwards*, 101 Wn. App. 560, 568 n.24, 4 P.3d 151 (2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

Determining whether Defendants are entitled to qualified immunity involves a three-step inquiry: (1) What specific right did Defendants allegedly violate? (2) Was that right "so clearly established as to alert a reasonable officer to its constitutional

parameters?" (3) If so, would a reasonable officer have believed that his conduct was lawful?

*Seaman v. Karr*, 114 Wn. App. 665, 679-80, 59 P.3d 701 (2002) (internal quotation marks omitted) (quoting *DeBoer v. Pennington*, 206 F.3d 857, 864 (9th Cir. 2000), *rev'd on other grounds sub nom. City of Bellingham v. DeBoer*, 532 U.S. 992, 121 S. Ct. 1651, 149 L. Ed. 2d 635 (2001)).

### 1. Specific right violated—Fourth Amendment freedom from unreasonable police intrusion

■ ¶42 To satisfy the first step of a qualified immunity analysis, " '[t]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.' " *Seaman*, 114 Wn. App. at 680 (alteration in original) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999)). To this end, "[t]he plaintiff's allegations are crucial to 'identify[ing] the contours of the right allegedly violated.' " *Seaman*, 114 Wn. App. at 680 (quoting *DeBoer*, 206 F.3d at 864).

■ ¶43 Osborne alleges that Seymour violated her Fourth Amendment right to be free from the unreasonable physical intrusion of law enforcement officers into her home.[33] She contends that Seymour violated this right

---

[33] Osborne also alleges a second and distinct way that Seymour violated her Fourth Amendment rights—that her protective order against Bird made Bird's activities inside her residence on July 28 unlawful, which Seymour's actions "affirmatively facilitated." Br. of Resp't at 21. Under this theory, Seymour also violated Osborne's Fourth Amendment rights independent of his own illegal entry into her house when he accompanied Bird to Osborne's residence and used his (Seymour's) presence as a law enforcement officer and the corresponding illusion of a "civil standby" to prompt Bird's illegal entry into Osborne's house to retrieve his possessions.

As we explain elsewhere in this opinion, Osborne's restraining order prohibited Bird from entering Osborne's residence without a court order; and neither Osborne's protection order nor Bird's order authorized any law-enforcement-accompanied "civil standby" exception. Seymour would have known about these restrictions had he read the orders; his failure to read them was inexcusable. Because there was no court order, no search warrant, and no exigent circumstance

when he entered her residence without her consent, a warrant, a court order, or an exigent circumstance authorizing his entry. This assertion involves no dispute of material fact: Seymour admitted that he physically entered Osborne's residence. It is well settled that "the protection of individuals from unreasonable government intrusion into their houses remains at the very core of the Fourth Amendment." *Murdock v. Stout*, 54 F.3d 1437, 1440 (9th Cir. 1995).[34] Osborne has thus satisfied the first step of the qualified immunity analysis by " 'defin[ing] at the appropriate level of specificity' " the right that Seymour allegedly violated. *Seaman*, 114 Wn. App. at 680 (quoting *Wilson*, 526 U.S. at 615).

## 2. Clearly established law

¶44 We now address whether Osborne's right to be free from the unlawful physical intrusion of law enforcement officials into her home, at the time of Seymour's alleged constitutional violation, was " ' "clearly established" as to alert a reasonable officer to its constitutional parameters.' " *Seaman*, 114 Wn. App. at 680 (quoting *DeBoer*, 206 F.3d at 864). For qualified immunity purposes, "clearly established" means:

> "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

---

justifying Seymour's physical intrusion into Osborne's residence or his accompanying Bird to enter the residence, qualified immunity does not insulate Seymour from Osborne's § 1983 action on either ground.

[34] *Abrogated on other grounds by LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000); *see also State v. Hatchie*, 161 Wn.2d 390, 397, 166 P.3d 698 (2007) ("We too have held a citizen's privacy is most protected in his or her home, and any intrusion into the home without a warrant is per se unreasonable.").

*Seaman*, 114 Wn. App. at 680-81 (internal quotation marks omitted) (quoting *Wilson*, 526 U.S. at 614-15).

¶45 Thus, the "salient question" under the second step of the qualified immunity analysis is whether the law provided Seymour with "fair warning" that his "actions were unconstitutional." *Beier v. City of Lewiston*, 354 F.3d 1058, 1068 (9th Cir. 2004) (citations and internal quotation marks omitted). In other words, on July 28, 2004, was federal law sufficiently clear to give Seymour "fair warning" that the Fourth Amendment prohibited him from physically entering Osborne's residence without a warrant, a court order, or other justification? *Beier*, 354 F.3d at 1068. Seymour answers this question in the negative, contending that his entry into Osborne's house was lawful because he was engaged in "a civil standby." Br. of Appellant at 18. This argument fails.

### a. Federal law[35]

¶46 "To determine whether a federal right is clearly established, we look first to United States Supreme Court precedent and then to decisions of the controlling Circuit Court of Appeals." *Seaman*, 114 Wn. App. at 680. "In the absence of controlling precedent, we broaden our survey to include all relevant caselaw in order to determine 'whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Denius v Dunlap*, 209 F.3d 944, 951 (7th Cir. 2000) (quoting

---

[35] 42 U.S.C. § 1983 concerns only "rights, privileges, or immunities secured by the Constitution"; thus, Seymour's § 1983 claim against Osborne hinges on her federal constitutional rights (specifically, her Fourth Amendment rights). We look first to applicable federal law because the Fourth Amendment applies to the states through the Fourteenth Amendment due process clause. *Malloy v. Hogan*, 378 U.S. 1, 10, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964); *see also Specht v. Jensen*, 832 F.2d 1516, 1521-22 (10th Cir. 1987) (citing *Benton v. Maryland*, 395 U.S. 784, 795, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969)).

As we explain, however, whether Seymour violated Osborne's Fourth Amendment rights depends, in part, on some state law issues. We therefore consider the applicability of state law in addition to federal law.

*Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989)).

¶47 Controlling federal precedent clearly establishes that a police officer violates a resident's Fourth Amendment rights by entering the home without a warrant, a court order, or other justification, such as an exigent circumstance. *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment.") Thus, federal law was sufficiently clear on July 28, 2004, to give Seymour "fair warning" that the Fourth Amendment prohibited him from physically entering Osborne's residence without a warrant, a court order, or other justification. *Beier*, 354 F.3d at 1068.

b. State law

¶48 Although federal law clearly establishes Osborne's Fourth Amendment right to be free from unauthorized government intrusions, whether Seymour had "fair warning" that he was violating Osborne's Fourth Amendment rights on July 28, 2004, also involves questions of state law. Seymour's actions would not have run afoul of Osborne's Fourth Amendment rights if a court order (such as the restraining orders) had expressly permitted those actions. *Katz*, 389 U.S. at 357 ("[S]earches conducted . . . *without prior approval* by judge or magistrate, are per se unreasonable under the Fourth Amendment." (emphasis added)). Whether the restraining orders here sanctioned a civil standby, in turn, depends on issues of state statutory interpretation because the Pierce County superior court issued the orders under state law. We now examine this state law.

### i. No statutory court-ordered authorization

¶49 RCW 26.50.080 permits courts to issue "civil standby" orders in cases of domestic violence.[36] This statute provides:

> (1) When an order is issued under this chapter [the Domestic Violence Prevention Act] upon request of the petitioner, *the court may order a peace officer to accompany the petitioner* and assist in placing the petitioner in possession of those items indicated in the order or to otherwise assist in the execution of the order of protection. . . .
>
> (2) *Upon order of a court, a peace officer shall accompany the petitioner* in an order of protection and assist in placing the petitioner in possession of all items listed in the order and to otherwise assist in the execution of the order.

RCW 26.50.080 (emphasis added).

¶50 Neither protection order here, however, contained such statutory language authorizing Bird to retrieve his possessions from Osborne's residence or authorizing any law enforcement officer to accompany Bird to "assist in placing [him] in possession" of any items. RCW 26.50.080. On the contrary, Osborne's protection order against Bird expressly (1) prohibited Bird's "[g]oing upon the premises of the petitioner's residence or workplace" and (2) provided that "ONLY THE COURT CAN CHANGE THE ORDER UPON WRITTEN APPLICATION." CP at 86 (Ex. 16). The record includes no such separate court-ordered authorization; nor does Seymour claim that such authorization existed. Similarly, Bird's form protection order left blank and unchecked the boxes that would have authorized law enforcement to accompany him for this purpose.[37] Thus,

---

[36] Although RCW 26.50.080 does not use the phrase "civil standby," our Supreme Court has used the phrase in this context. *See Beal*, 134 Wn.2d at 773-74.

[37] Although Adams testified that a protection order might permit a civil standby even "if the box isn't checked," he further explained, "[S]ome [judges] won't check it, some judges will then direct us to do it irrespective of what box is checked." CP

neither RCW 26.50.080 nor any court order authorized Seymour to enter Osborne's residence or to accompany Bird to retrieve his personal belongings.

¶51 Nevertheless, Seymour argues that RCW 26.50.080 does not contain any language "*prevent*[*ing*] a peace officer from assisting the petitioner *absent* an explicit court order." Br. of Appellant at 25 (second emphasis added). According to Seymour, the absence of such language implicitly authorized his intrusion into the residence. This argument also fails. Although, as Seymour notes, RCW 26.50.080 contains no language expressly prohibiting an officer from entering a residence in the absence of a court order, this "omission" did not authorize his entry into Osborne's home. On the contrary, such language would be unnecessary because both state and federal constitutions already expressly prohibit such law enforcement warrantless entry of a private home absent specific exigent circumstances, none of which existed here. *See Payton v. New York*, 445 U.S. 573, 585-86, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980) (" '[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " (quoting *United States v. U.S. Dist. Court*, 407 U.S. 297, 92 S. Ct. 2125, 32 L. Ed. 2d 752 (1972))); *see also State v. Hatchie*, 161 Wn.2d 390, 397, 166 P.3d 698 (2007) ("[A]ny intrusion [by the State] into the home without a warrant is per se unreasonable.").

### ii. No other authorization

¶52 Because neither the protection orders nor RCW 26.50.080 authorized Seymour's entry into Osborne's residence, the only other grounds that would have permitted such an intrusion were a separate court order, a warrant, or exigent circumstances. Seymour, however, admits that (1) he did not have a warrant or any other court order permitting him to enter Osborne's residence; (2) he was not

at 741. But the record here contains no such directive by the superior court commissioner who signed Bird's protection order.

investigating a crime; and (3) he did not believe any lives were in danger when he intruded into Osborne's residence. Furthermore, accompanying Bird did not authorize Seymour's intrusion because Osborne's protection order prohibited Bird from entering Osborne's home. That Seymour did not make the effort to read this court order does not excuse his ignorance of its parameters or his erroneous assumption that it authorized, as he put it, a "civil standby." CP at 156.

### iii. No uncertainty in the law

¶53 Despite the absence of any explicit authorization to accompany Bird to retrieve his possessions from Osborne's home, Seymour baldly asserts that there was an "uncertain legal effect under Washington law of the protection orders both Osborne and Bird relied upon." Br. of Appellant at 23. Again, we disagree. The protection orders were clear: By their plain language, neither order permitted a "civil standby," which Seymour admitted below.[38] Furthermore, despite Bird's explicit petition for possession of his "Harley Davidson, Yamaha motorcycles, trailer, clothing, [and] essential items,"[39] the commissioner's order did not grant him that request. Accordingly, we hold that the legal effect of the protection orders was not "uncertain"—clearly neither entitled Bird to a so-called "civil standby"[40] under RCW 26.50.080.

### 3. Objective Reasonableness

¶54 Having "clearly established" the unlawfulness of Seymour's entering Osborne's private residence on

---

[38] On the contrary, as we have already noted, Bird's protection order against Osborne clearly omitted such authorization rather glaringly by virtue of the absence of check marks, which the court commissioner could have used to authorize a civil standby but did not.

[39] CP at 1051.

[40] Br. of Appellant at 23.

July 28, 2004, we next address the third, and final, step of the qualified immunity analysis—"would a reasonable officer have believed that his conduct was lawful?" *Seaman*, 114 Wn. App. at 680. Seymour argues that (1) it was reasonable to believe that his intrusion into Osborne's residence was lawful; and (2) in the alternative, the legality of his actions depends on genuine issues of material fact, thus precluding summary judgment. Again, we disagree.

¶55 At the outset we again note that especially in light of Seymour's position and experience with the sheriff's DVU, he reasonably should have read the protection orders before taking any action. Had he done so, he would have known that these orders not only failed to authorize a "civil standby," but also expressly prohibited Bird's entering the home absent a court order so authorizing. But Seymour failed to "review[ ] the orders and look[ ] at the language" and, instead, apparently assumed they authorized a "civil standby." CP at 247. Such an error, caused by a failure to "learn[ ] the terms of [a] protection order," is "not one a reasonably competent officer should make." *Beier*, 354 F.3d at 1071.

### a. Case law

¶56 Seymour cites several cases in support of his assertion that a reasonable officer would have believed that his physical intrusion into Osborne's residence was lawful. None of these cases support his position.

### i. *Kalmas*—"community caretaking function"

¶57 At the outset, we note that Seymour cites a case from our Supreme Court, *Kalmas v. Wagner*, 133 Wn.2d 210, 943 P.2d 1369 (1997). Because Osborne grounds her claim against him in 42 U.S.C. § 1983, only Osborne's federal constitutional rights are at issue; precedent from our state Supreme Court "do[es] not alter" federal constitutional rights. *See Virginia v. Moore*, 553 U.S. 164, 176, 128 S.

Ct. 1598, 170 L. Ed. 2d 559 (2008). Nevertheless, we recognize that a reasonable officer may look to our state's precedent when considering whether his conduct is lawful. As we explain above, Seymour's conduct on July 28, 2004, would not have violated Osborne's Fourth Amendment rights if the restraining orders, issued under state law, had permitted his actions. Thus, Washington state case law is relevant when determining whether Seymour's conduct satisfied the objectively reasonable prong of our qualified immunity analysis in the Fourth Amendment context here.

¶58 Citing *Kalmas*, Seymour argues that his entry into Osborne's residence fell under the " 'community caretaking function' " exception to the Fourth Amendment's warrant requirement. Br. of Appellant at 18 (quoting *Kalmas*, 133 Wn.2d at 217). In *Kalmas*, our Supreme Court affirmed a trial court's summary judgment grant of defendant police officers' motion to dismiss plaintiff's § 1983 claims against them where one of the plaintiffs called the officers and the officers entered the residence with the other plaintiff's consent. *Kalmas*, 133 Wn.2d at 213-14, 220. The property manager served the plaintiffs, jointly renting a home, with notice of tenancy termination and gave them 24-hour notice that a real estate agent would be showing the property. *Kalmas*, 133 Wn.2d at 213. One plaintiff, however, stood outside and belligerently refused to allow the property manager, real estate agent, and prospective buyer into the home. *Kalmas*, 133 Wn.2d at 213. The other plaintiff, who remained inside the home during this confrontation, called 911 and requested assistance. *Kalmas*, 133 Wn.2d at 214. Two deputy sheriffs arrived, spoke to the property manager, learned about the situation, told the belligerent plaintiff that under the Landlord-Tenant Act, ch. 59.18 RCW, he did not have the right to prohibit the others from entering, and advised the plaintiff that the officers would arrest him if he did not back down. *Kalmas*, 133 Wn.2d at 214. The plaintiff acceded, but he requested that the property manager and her fellow employee enter the premises accompanied by one of the deputies. *Kalmas*, 133 Wn.2d at 214.

¶59 "Both officers state[d] their purpose was to keep the peace and prevent any kind of confrontation between the parties." *Kalmas*, 133 Wn.2d at 214. One officer was present inside the residence for less than a minute, during which he did not disturb anything. *Kalmas*, 133 Wn.2d at 217. The Washington Supreme Court held that the officers did not commit an "unreasonable search" in violation of the Fourth Amendment: (1) "[T]he public's interest in having the police perform a 'community caretaking function'" outweighed "the individual's interest in freedom from police interference," *Kalmas*, 133 Wn.2d at 216-17 (quoting *State v. Mennegar*, 114 Wn.2d 304, 313, 787 P.2d 1347 (1990), *overruled on other grounds by State v. Hill*, 123 Wn.2d 641, 645, 870 P.2d 313 (1994)); and (2) "where a plaintiff invites a deputy into his residence in order to perform a caretaking function, we cannot find that an unreasonable search occurred." *Kalmas*, 133 Wn.2d at 217.

¶60 Because of its distinguishing facts, *Kalmas* does not apply here. At the belligerent plaintiff's request, the officers in *Kalmas* accompanied a private person, the property manager, who had a legal right to enter the residence. In contrast, Seymour and Bird had neither a legal right nor the occupant's consent to enter the residence. *Kalmas* does not support Seymour's argument that a reasonable officer in the circumstances here would have believed that his conduct was lawful.

### ii. *Malatesta*—qualified immunity

¶61 Seymour next cites *Malatesta v. New York State Division of State Police*, 120 F. Supp. 2d 235, 237-38 (N.D.N.Y. 2000), in which a federal district court ruled that police officers were entitled to qualified immunity because "'officers of reasonable competence could disagree on the legality' of their actions." Br. of Appellant at 21 (internal quotation marks and citations omitted) (quoting *Malatesta*, 120 F. Supp. 2d at 240). Granting the defendant police

officers' motion for summary judgment, the district court dismissed plaintiff's § 1983 claim based on officers' mistaken search of property with a warrant and mistaken seizure of a truck in response to a grandfather's request for aid in repossessing it from his grandson. *Malatesta*, 120 F. Supp. 2d at 240. Agreeing with the defendants, the district court ruled, (1) "The extent to which police officers can act to prevent a breach of the peace at the scene of a self-help repossession is less than clear"; (2) "neither party has cited a case which directly addresses the constitutionality of a 'civil standby' "; (3) "the New York State Police have had a long-standing practice of performing civil standbys to prevent breaches of the peace during private repossessions"; and (4) "reasonable police officers could disagree over the lawfulness of the . . . entry onto plaintiff's property." *Malatesta*, 120 F. Supp. 2d at 240.

¶62 *Malatesta* does not, however, support Seymour's argument that reasonable officers could disagree about the lawfulness of his actions here because *Malatesta* addressed a different issue. In *Malatesta*, the grandfather was engaged in "self-help repossession" to take back a truck that he legally owned from his grandson's property, from which no legal order prevented his entering. *Malatesta*, 120 F. Supp. 2d at 240. Here, in contrast, Osborne's protection order expressly prohibited Bird from being at her residence without a specific court order and Bird knew this. Thus, unlike the grandfather in *Malatesta*, there was little chance that Bird would attempt a private repossession by himself without law enforcement accompaniment and, therefore, no need for the police to intervene to prevent a breach of the peace during a private repossession.

¶63 In concluding that "[t]he extent to which police officers can act to prevent a breach of the peace at the scene of a self-help repossession is less than clear," the district court in *Malatesta* ruled only that the Fourth Amendment did not provide well-defined protections when police officers, based on their own sense of prudence to prevent

violence, accompany a private citizen on a private, legal, self-help repossession. 120 F. Supp. 2d at 240. Here, in contrast, the contours of the Fourth Amendment are clear: The court orders prohibited Bird from going to or entering Osborne's residence; therefore, the police officers, including Seymour, had no derivative authority from these court orders, or any other law, to accompany Bird to the residence. Nothing about the circumstances here is "less than clear" as it was in *Malatesta*. 120 F. Supp. 2d at 240. Accordingly, *Malatesta* does not support Seymour's argument.

### iii. *Hensley*—reasonable action

¶64 In his statement of additional authorities, Seymour cites another repossession case, *Hensley v. Gassman*, 763 F. Supp. 2d 876 (E.D. Mich. 2011). Gassman, a private citizen who "made a profession of repossessing collateral for lenders,"[41] requested police presence while he repossessed Hensley's vehicle following a month-old "directive from a creditor, [but] not a court order, to repossess" the vehicle; at the time of the repossession, however, "the payments on the car had been made and the creditor had retracted the directive." *Hensley*, 763 F. Supp. 2d at 880 & n.3. Gassman "represented to the [deputies] that he had an order for repossession of [Hensley's vehicle], and both deputies saw corroborating paperwork in his hand but did not read the papers." *Hensley*, 763 F. Supp. 2d at 880. Hensley was not at home during the repossession, but his wife explained to Gassman and the deputies "that the payments had been brought current with the lender." *Hensley*, 763 F. Supp. 2d at 880. After an officer advised Hensley's wife that she could bring this payment information to the creditors' attention in the morning, Gassman proceeded with the repossession. *See Hensley*, 763 F. Supp. 2d at 880-82.

¶65 The Hensleys brought a § 1983 claim against the deputies for unlawful seizure of their vehicle. *Hensley*, 763

---

[41] *Hensley*, 763 F. Supp. 2d at 880.

F. Supp. 2d at 879. The deputies moved for summary judgment, arguing that they were entitled to qualified immunity. *Hensley*, 763 F. Supp. 2d at 879, 884-88. The federal district court agreed, ruling that the deputies "reasonably, though mistakenly, believed that there was a repossession order even though the [deputies] did not verify the legitimacy of the file in Gassman's possession," without, however, explaining the basis for its ruling that the deputies' acted "reasonably" when they failed to verify the allegedly corroborating documents. *Hensley*, 763 F. Supp. 2d at 888. Not only is this federal trial court ruling nonbinding on us, but also we find this lack of an articulated rationale unpersuasive, especially in light of *Hensley*'s distinguishable facts.[42] *See, e.g., Humleker v. Gallagher Bassett Servs., Inc.*, 159 Wn. App. 667, 681, 246 P.3d 249 ("A federal district court's determination is not binding on Washington courts."), *review denied*, 171 Wn.2d 1023 (2011).

### iv. *Harvey*

¶66 Also in his statement of additional authorities, Seymour cites *Harvey v. Plains Township Police Department*, 635 F.3d 606 (3d Cir. 2011). Harvey, a private citizen, brought a § 1983 claim against a police officer who had assisted her ex-boyfriend in obtaining personal possessions from her apartment while she was not home, despite a "protection from abuse order" that granted her exclusive possession of the once-jointly-rented apartment. *Harvey*, 635 F.3d at 608. The federal district court instructed that in

---

[42] The deputies in *Hensley* had no special training with repossession or the paperwork authorizing repossessions; therefore, arguably it was not reasonable for them to have doubted that Gassman's papers from Hensley's creditors authorized the repossession. In contrast, Seymour was the supervisor of the Pierce County Sheriff's Department's Domestic Violence Unit; therefore, it is reasonable to infer that before allowing a civil standby in a potentially volatile domestic situation, an officer in his position would first verify paperwork purportedly authorizing such civil standby. Moreover, other Pierce County officers whom Bird had contacted had read the protective orders and found "no authority" permitting law enforcement to help Bird. CP at 813. The reasonable actions and judgment of these other officers underscore the unreasonableness of Seymour's actions.

order to find that the police officer "act[ed] under color of state law," the jury had to answer only one question: Did the police officer order the landlord to open the apartment door? *Harvey*, 635 F.3d at 609. The jury answered this question in the negative, and Harvey appealed. *Harvey*, 635 F.3d at 609. On appeal, the Third Circuit reversed and remanded for a new trial, holding that the jury instruction and verdict form were erroneous because "[t]he state action question must be addressed after considering the totality of the circumstances and cannot be limited to a single factual question." *Harvey*, 635 F.3d at 610-11.

¶67 Thus, the legal issue in *Harvey* is distinct from the relevant issues here. Neither party disputes that Seymour's conduct on July 28, 2004, rose to the level of state action. Seymour's reliance on *Harvey* therefore is misplaced.

### b. Disapproval of fellow officers

¶68 In further support of his argument that his conduct was reasonable, Seymour claims that "other law enforcement personnel expressed conflicting views on the appropriateness" of his conduct. Br. of Appellant at 23. But, even viewed in a light most favorable to Seymour, the evidence does not support this claim. First, Seymour points to no evidence showing that he contacted any of his superiors or any other law enforcement officers in the DVU "to ask them whether they thought it was appropriate to do a civil standby for Lloyd Bird" or that any fellow officers believed that accompanying Bird to Osborne's home was reasonable. CP at 122. In contrast, when Bird first contacted Sergeant Cassio for his assistance in retrieving his possessions from Osborne's home, Cassio examined the protection orders, believed that Bird lacked authorization to engage in a "civil standby," and communicated to Bird this belief and his unwillingness to assist Bird. *See* CP at 812-14.

¶69 Deputy Aloisio also shared Cassio's belief. Despite having accompanied Seymour and Bird to retrieve Bird's

possessions from Osborne's home, once there, Aloisio asked Seymour to "make it stop," telling Seymour that he (Aloisio) thought the officers "were not following . . . procedure." CP at 165, 189. It had been Aloisio who had secured Osborne's order against Bird, and Aloisio "wasn't aware of a civil standby clause in that order." CP at 181. Telling Sergeant Stonack he felt "uncomfortable," Aloisio "objected" to Seymour's and Bird's entry into Osborne's home. CP at 166, 251.

¶70 Nor did Seymour ask Adams, the department's legal advisor, for advice about a "civil standby" in these circumstances. (Seymour also failed to tell Adams that the restraining orders in place did not give explicit permission for a civil standby.) Thus, Seymour cannot rely on the "attorney's advice" argument for evidence of "good faith" to justify the alleged "reasonable[ness]" of his actions and assertion of qualified immunity. *Dixon v. Wallowa County*, 336 F.3d 1013, 1019 (9th Cir. 2003) (attorney must have "all the relevant facts" for his advice to support an officer's qualified immunity defense). Moreover, Seymour cannot rely on "advice" that Bird or deputy clerk Schaub told him because Schaub was not an attorney and the DVU had a sign stating, "[C]lerks are not allowed to give legal advice." CP at 205. Thus, the record does not support Seymour's assertion that "conflicting views" showed he acted reasonably in entering Osborne's home. Br. of Appellant at 23.

### c. Competing interests

¶71 Seymour next asserts that "[w]hether a civil standby may be conducted requires a balancing of the competing societal and privacy interests at stake under the particular circumstances." Reply Br. of Appellant at 14. We agree: As at least two Circuit Courts of Appeal have explained, the constitutionality of an officer's "community caretaking function" actions " 'requires a reviewing court to balance the governmental interest in the police officer's exercise . . . and the individual's interest in being free from arbitrary gov-

ernment interference.' " *Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2006) (internal quotation marks omitted) (quoting *Winters v. Adams*, 254 F.3d 758, 767 (8th Cir. 2001) (Bye, J., concurring)). But balancing these competing interests here does not render Seymour's unauthorized actions reasonable.

¶72 As we previously contrasted with some of the "self-help" repossession cases, the situation here did not present competing societal and privacy interests that required balancing by law enforcement.[43] On the contrary, a superior court commissioner had already implicitly completed such balancing when, in granting Bird's protection order against Osborne, he did not grant Bird's request for police officers to accompany him to Osborne's residence to retrieve his personal possessions. This lack of authorization both prohibited Bird from approaching the residence and prevented Seymour from accompanying Bird and engaging in a "civil standby."

¶73 Seymour suggests that requiring "express judicial authorization" for law enforcement to accompany a citizen under a protection order to retrieve personal property from the prohibited residence "would only encourage . . . self-

---

[43] Even assuming, without deciding, that a governmental interest could arguably override the commissioner's refusal to permit a civil standby, this case does not present a strong governmental interest. There was undisputed testimony that "[a] civil standby is for . . . personal items, items for work," "personal effects that are tools of the trade for your business so that you're able to keep functioning, and any pertinent toiletries." CP at 1016, 1095. But the record shows that neither Bird nor Seymour needed to enter Osborne's home to recover Bird's "tools of the trade," because the day after Osborne secured the protection order against Bird (and two days before Bird and Seymour entered her house), Seymour went to Osborne's residence and retrieved Bird's handguns, his "commission card," his "wallet badge," and his "access card." CP at 102, 1095.

In contrast, on July 28, 2004, Seymour stood inside Osborne's residence as Bird took possession of items that were not tools of his trade: a pickup truck, a Harley Davidson motorcycle, televisions, and a "bunch of bags" of possessions, which were so numerous that Seymour could no longer inventory them. CP at 165-66. Nothing in the record or in common understanding shows a strong governmental interest in allowing Bird to obtain possession of his motorcycle, televisions, and other possessions that were not tools of his trade, especially when balanced against a court order forbidding such intrusion to further the strong governmental interest in keeping the peace in domestic violence situations.

help." Reply Br. of Appellant at 11. But if Bird engaged in "self-help," then the role of law enforcement officers should have been to arrest him for violating the protection order, not to assist him in the furtherance of that violation, as Seymour did here. Moreover, Seymour's argument slights the role of the judiciary: If in entering a protection order, a judge or commissioner refrained from granting "express judicial authorization"[44] for officers to engage in certain actions (as here, where the court commissioner who signed the protection order refused to grant Bird's request to retrieve personal possessions), the presumption should be that the judge or commissioner intended *not* to give law enforcement authority to engage in such actions, rather than to presume such authority from silence on the subject, as Seymour contends.

¶74 Seymour's additional contention—"had the officers waited until Osborne returned to the home, the potential for a confrontation would have dramatically increased"[45]— ignores that under the facts of this case and the existing court orders, the officers were not authorized to accompany Bird to Osborne's residence at all, regardless of whether she was home. In other words, had the officers, including Seymour, simply followed the law and the court orders, there should have been no risk of a confrontation.

¶75 Also weighing against a strong governmental interest here is the " 'chief evil against which the wording of the Fourth Amendment is directed' "—the government's " 'physical entry' " into a private home without legal authorization. *Payton,* 445 U.S. at 585-86 (quoting *U.S. Dist. Court,* 407 U.S. at 313). Our nation "has long recognized that the home provides a special kind of sanctuary in modern life," and the highest court in the land "ha[s] long accorded special deference to the privacy of the home." *McDonald v. City of Chicago,* ___ U.S. ___, 130 S. Ct. 3020,

---

[44] Reply Br. of Appellant at 11.

[45] Reply Br. of Appellant at 11.

3105, 177 L. Ed. 2d 894 (2010). Osborne's Fourth Amendment right to be free from the unlawful, physical intrusion of police officers into her residence existed on July 28, 2004, when Seymour and Bird entered without legal authorization. Because Osborne's Fourth Amendment right was clearly established and there was no lawful justification for Seymour's entry into her home, Seymour had "fair warning" that his actions on July 28 violated that right. *Beier*, 354 F.3d at 1068. No reasonable officer could conclude that Seymour's conduct was lawful.

### 4. No disputed issues of material facts

¶76 Seymour proffers several facts that he alleges were in dispute and should, therefore, have provided grounds for denying summary judgment to Osborne: (1) "whether Osborne had anticipated that Bird would retrieve his items from the home prior to the August 6th show cause hearing"; (2) "whether Sgt. Seymour properly inventoried and photographed the items removed from Osborne's home"; (3) "whether supervising University Place officer Sgt. Stonack supported conducting the civil standby"; and (4) "whether Sgt. Seymour's discussion with the Deputy Clerk [Schaub] gave him a reasonable basis for believing that [a] civil standby could occur in the absence of express judicial authorization." Reply Br. of Appellant at 18. We disagree with Seymour that these facts gave rise to genuine issues of material fact that should have defeated summary judgment.

¶77 Seymour contends that Osborne's packing up some of Bird's belongings and putting them in the back of a pickup truck in her garage raised a factual issue about whether Osborne expected Bird to retrieve belongings from her residence. We disagree. Especially where the protection order expressly forbade Bird's encroachment on Osborne's residence, merely packing up Bird's belongings and placing them in the pickup were not "activities or circumstances

within a dwelling [that] may lessen the owner's reasonable expectation of privacy by creating a risk of which is 'reasonably foreseeable.' " *United States v. York*, 895 F.2d 1026, 1029 (5th Cir. 1990) (citing *United States v. Bomengo*, 580 F.2d 173 (5th Cir. 1978), *cert. denied*, 439 U.S. 1117 (1979)).[46] Moreover, Seymour did not even know that Osborne had packed up some of Bird's belongings until Seymour, Bird, and the others arrived at Osborne's residence and Bird opened the garage door and entered her home. At this point, Bird had already violated the terms of the protection orders and Seymour had already intruded, or was about to intrude in Osborne's residence without a court order, a warrant, or other sufficient legal justification. Thus, Seymour cannot use Osborne's having packed up some of Bird's belongings as an after-the-fact justification for violating her Fourth Amendment rights.

¶78 Nor were there any material disputed facts about the extent to which Seymour "properly inventoried and photographed the items removed from Osborne's home." Reply Br. of Appellant at 18. On the contrary, Seymour's monitoring of Bird's repossession activities or inventorying what he removed from the house were immaterial to the summary judgment issues. Again, the protection orders did not authorize Bird, Seymour, or any other law enforcement officer to conduct any repossession activities at Osborne's home; therefore, there was no triggering of a need for proper inventorying and monitoring of repossession of personal items.

¶79 Similarly, it was not material that Stonack, the PCSD sergeant and Bird's personal friend who was present on July 28, may have believed the civil standby was legal.

---

[46] In contrast, the "activit[y]" that reduced the homeowner's expectation of privacy in *York* was giving permission to a family to live with the homeowner. *York*, 895 F.2d at 1029. Osborne did not engage in such an activity here: Not only did she not invite Bird to return to the residence to live with her, but rather she obtained a protection order prohibiting him from even entering her residence. Thus, unlike the homeowner in *York*, Osborne did not have a diminished expectation of privacy.

Such a fact, even if the record supported it, would not be sufficient grounds to reverse the trial court's summary judgment orders. As we have previously noted, a material fact for summary judgment purposes is " 'one upon which the outcome of the litigation depends.' " *Humleker*, 159 Wn. App. at 674 (quoting *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993)). Ample other evidence in the record significantly outweighed Stonack's belief: (1) Neither protection order authorized a civil standby (despite Bird's request for possession of his personal property), and, in fact, Osborne's protection order specifically prohibited Bird from entering her home; (2) Seymour failed to read the protection orders to determine whether either order authorized a "civil standby" or prohibited Bird's contacting Osborne; (3) Seymour lacked a warrant, a court order, or exigent circumstance authorizing his accompanying Bird and entering Osborne's residence; (4) Seymour did not seek approval of his proposed actions from any of his superiors or his department's legal advisor; (5) fellow officers Cassio and Aloisio expressed their disapproval of Seymour's "civil standby" and doubts about its legality; and (6) Seymour already had retrieved Bird's tools of the trade from Osborne's home two days before returning with Bird and entering her home while she was away.

¶80 Nor was it material that there was a potential issue of fact regarding Seymour's "discussion with the Deputy Clerk [Schaub, which] gave him a reasonable basis for believing that [a] civil standby could occur in the absence of express judicial authorization." Br. of Appellant at 18. Even if the content of Seymour's discussion with Schaub were subject to dispute, such dispute would be insufficient to warrant reversing the summary judgment orders. Seymour himself admitted that (1) Schaub did not provide any thoughts about whether the protection orders specifically permitted Bird to engage in a "civil standby"; and (2) Schaub "wasn't looking at the hard copy of the orders" when Seymour spoke to her. CP at 117. Moreover, because Schaub

is not an attorney, her advice could not render Seymour's conduct any more reasonable. *See Dixon*, 336 F.3d at 1019.

¶81 Accordingly, we affirm the trial court's summary judgment orders because "no reasonably competent officer would have concluded" that Seymour's physical entry into Osborne's residence—without the authorization of either a protection order, a warrant, or exigent circumstances—was lawful. *Malley*, 475 U.S. at 341.

## II. ATTORNEY FEES

### A. Trial

¶82 Finally, Seymour argues that the trial court erred in awarding fees and costs of $340,654.14, "over twenty times the jury's verdict against [him]." Br. of Appellant at 30. More specifically, Seymour contends:

> The trial court recognized that plaintiff could not be awarded fees for her state law claims against Bird, and reduced the fees by one-third, on the theory that the claims against Bird were one-third of the claims on which the case went to trial. The trial court erred, however, in not further reducing the fees to reflect the plaintiff's lack of success in her sole remaining claim against [Pierce] County.

Br. of Appellant at 33-34 (citations omitted). We agree.

¶83 We review " '[a]n attorney[ ] fee award under 42 U.S.C. § 1988[47] [for] an abuse of discretion . . . ; discretion is abused when its exercise is manifestly unreasonable or based on untenable grounds or reasons.' " *Parmelee v. O'Neel*, 168 Wn.2d 515, 521, 229 P.3d 723 (2010) (quoting *Ermine v. City of Spokane*, 143 Wn.2d 636, 641, 23 P.3d 492 (2001)). "In determining reasonable attorney fees, the trial court must first calculate the 'lodestar' figure,"

---

[47] 42 U.S.C. § 1988(b) provides, in relevant part: "[T]he court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs" for "any action or proceeding to enforce a provision of [among others, 42 U.S.C. § 1983]."

which "represents the number of hours reasonably expended (discounting hours spent on unsuccessful claims, duplicated effort, and otherwise unproductive time) multiplied by the attorney's reasonable hourly rate." *Smith v. Behr Process Corp.*, 113 Wn. App. 306, 341, 54 P.3d 665 (2002) (citing *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597, 675 P.2d 193 (1983)). As the United States Supreme Court recently reaffirmed, 42 U.S.C. § 1988 "was 'never intended to produce windfalls' for parties." *Fox v. Vice*, ___U.S.___, 131 S. Ct. 2205, 2216, 180 L. Ed. 2d 45 (2011) (quoting *Farrar v. Hobby*, 506 U.S. 103, 115, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992)). "Necessarily [then, the lodestar method] requires the court to exclude from the requested hours . . . any hours pertaining to unsuccessful theories or claims." *Mahler v. Szucs*, 135 Wn.2d 398, 434, 957 P.2d 632, 966 P.2d 305 (1998) (citing *Scott Fetzer Co. v. Weeks*, 122 Wn.2d 141, 151, 859 P.2d 1210 (1993)).

 ¶84 Although relevant in determining the reasonableness of a fee award, the amount of the recovery "is not a conclusive factor." *Mahler*, 135 Wn.2d at 433 (citing *Beeson v. Atl.-Richfield Co.*, 88 Wn.2d 499, 563 P.2d 822 (1977)). An appellate court will not overturn a large attorney fee award in civil litigation merely because the amount at stake in the case is small. *Mahler*, 135 Wn.2d at 433; *see also Martinez v. City of Tacoma*, 81 Wn. App. 228, 241-44, 914 P.2d 86 (1996); *Steele v. Lundgren*, 96 Wn. App. 773, 782-84, 982 P.2d 619 (1999), *review denied*, 139 Wn.2d 1026 (2000).

¶85 In addressing the trial court's attorney fee award, we again recount the trial litigation landscape. There were three named defendants: Bird, Seymour, and Pierce County. Osborne had four claims against Bird: assault, tortious interference with employment, trespass, and "outrage." CP at 337. Toward the end of trial, Osborne "abandoned" her assault claim. VRP (June 29, 2009) at 149-50. The jury then found that Bird had committed trespass against Osborne and awarded $15,000 in damages for this trespass. The

jury did not find, however, that Bird had tortiously interfered with Osborne's employment or engaged in outrageous conduct.

¶86 Osborne had one § 1983 claim against Pierce County, which rested on two different theories, one of which was successful and one of which was not. The jury rejected the first theory, finding that Seymour did not act "in accordance with a longstanding custom, policy, or practice" of Pierce County. CP at 437. The jury did find, however, that Pierce County had "fail[ed] to train . . . Seymour, to handle civil standbys" and "act[ed] with deliberate indifference to the obvious consequences of its failure to provide adequate training to Defendant Seymour." CP at 437. But the jury did not find that this "failure to train was the moving force that caused injury or damage to . . . Osborne," and, thus, the jury did not assess damages against Pierce County. CP at 437.

¶87 Osborne also had one § 1983 claim against Seymour, for which the jury had to decide only her damages. The jury assessed $2,500 in compensatory damages and $15,000 in punitive damages against Seymour.

¶88 In its Findings of Fact and Conclusions of Law granting Osborne's motion for attorney fees and costs, the trial court explained, "[I]t is impossible for the Court to segregate out how much . . . trial preparation and trial time was spent on the Bird claims [of assault, tortious interference with employment, trespass, and 'outrage']," but "the Bird claims constituted approximately one-third of the claims that went to trial."[48] CP at 707 (Findings of Fact (FF) 30). The trial court painstakingly explained the details of its lodestar calculations in reducing Osborne's attorney fees by one-third, from $452,911.12 to $303,450.45. The trial court did not, however, similarly carefully calculate and reduce Osborne's attorney fee request commensurate with the amount of trial preparation and trial time spent on her

---

[48] As we explain above, six claims actually went to trial. But one-half of those claims were against Bird, not one-third, as the trial court noted.

claim against Pierce County, despite the jury's finding that Pierce County's policy and training lapses had no causal relationship to Seymour's violation of Osborne's Fourth Amendment rights. Instead, the trial court entered an Order and Judgment against Seymour, assessing $303,450.45 in attorney fees and $37,203.69 in costs for him to pay Osborne.

¶89 By reducing Osborne's requested attorney fees by one-third, the trial court implicitly acknowledged that it was unfair to assess attorney fees against Seymour for Osborne's claims against Bird. We cannot tell from the record, however, why the trial court did not similarly reduce the attorney fees award further to reflect the similar unfairness in assessing attorney fees against Seymour for Osborne's § 1983 claim against Pierce County.[49] Holding this oversight erroneous, we vacate the trial court's attorney fee and costs award and remand with instructions to reduce the award to include the attorney fees and costs attributable only to Osborne's litigation of her § 1983 claim against Seymour.

---

[49] We disagree with Osborne's contention that we should not disturb the trial court's attorney fee award "[b]ecause all claims brought to trial involve a common core of facts or are based on related legal theories." Br. of Resp't at 45. On the contrary, the trial court did not find the purported intertwinement of facts and law in this case to be an obstacle to reducing the attorney fee award by the amount attributable to her claim against Bird: Although the trial court noted that it was "impossible . . . to segregate" how much of the attorney fees went to Osborne's claims against Bird, nevertheless, it proceeded to reduce Osborne's attorney fee request by one-third. CP at 707 (FF 30).

We further disagree with Osborne's characterization of her § 1983 claims against Seymour and Pierce County as unseparable for attorney fee award purposes. Osborne's § 1983 claims against Seymour and Pierce County rested on different legal theories and required different quantities and types of proofs. Osborne's § 1983 claims against Pierce County focused on (1) the Pierce County Sheriff's Department as an institution; (2) the policies, practices, and customs that pervaded this institution; (3) in entering Osborne's home, whether Seymour had acted according to official County policy; and (4) whether those policies adequately trained Seymour for the type of situation that this case presented. In contrast, because the trial court had already determined that Seymour was liable under 42 U.S.C. § 1983 for violating Osborne's Fourth Amendment rights, the trial of her § 1983 claim against Seymour was limited to damages.

## B. On Appeal

¶90 Osborne requests attorney fees on appeal, but she fails to "devote a section of [her] brief to the request for fees and expenses" and she fails to cite authority, contrary to RAP 18.1(b).[50] RAP 18.1(b) requires argument and citation to authority to advise us of the appropriate grounds for an award of attorney fees and costs. *Austin v. U.S. Bank of Wash.*, 73 Wn. App. 293, 313, 869 P.2d 404, *review denied*, 124 Wn.2d 1015 (1994). This requirement is mandatory. *Phillips Bldg. Co. v. An*, 81 Wn. App. 696, 705, 915 P.2d 1146 (1996). This requirement also demands more than a bald request for attorney fees on appeal. *Thweatt v. Hommel*, 67 Wn. App. 135, 148, 834 P.2d 1058, *review denied*, 120 Wn.2d 1016 (1992). Thus, we deny Osborne's request for attorney fees on appeal based on her failure to comply with the RAP.[51]

¶91 We affirm the trial court's summary judgment rulings in Osborne's favor, vacate the trial court's attorney fees and costs award, and remand with instructions to reduce the award to include attorney fees and costs attributable only to Osborne's litigation of her § 1983 claim against Seymour.

WORSWICK, A.C.J., and ARMSTRONG, J., concur.

---

[50] Instead, Osborne states only, "The decision should be affirmed and Respondent should be awarded fees on appeal." Br. of Resp't at 47.

[51] But even were we to consider Osborne's request for attorney fees on appeal as being based on 42 U.S.C. § 1988, which allows us to award attorney fees to the "substantially prevail[ing]" party, *Staats v. Brown*, 139 Wn.2d 757, 781, 991 P.2d 615 (2000), we would still deny her attorney fees. Although on appeal Osborne prevails on her § 1983 liability and damages claim against Seymour, she does not prevail in her challenge to the amount of the trial court's attorney fee award, which we vacate and remand to the trial court to reduce. Thus, we could not say that she was the "substantially prevailing party" for purposes of a 42 U.S.C. § 1988 attorney fee award.