# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Marriage of

JANICE RIOS-NEGRON,

               Respondent,

and

PEDRO FIGUEROA-VARGAS,

               Appellant.

No. 78251-7-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: August 12, 2019

APPELWICK, C.J. — Rios-Negron and Figueroa-Vargas had a parenting plan under which the parties' child resided with the mother a majority of the time. The parties did not follow the plan closely. The mother served the father with a notice of intent to relocate pursuant to the child relocation act.[1] The father objected, arguing that the parents in reality had equal residential time, and therefore the mother could not benefit from the statutory presumption allowing relocation. The trial court found that the child, in fact, spent the majority of time with the mother, and granted the relocation. We affirm.

## FACTS

Janice Rios-Negron and Pedro Figueroa-Vargas are the parents of daughter J.F-R. The parties dissolved their marriage in 2009. The mother moved with J.F-R to Arizona before the dissolution was final. Under the parenting plan, J.F-R lived a majority of the time with her mother, and resided with her father every

---

[1] RCW 26.09.405-.560.

other weekend. They moved back to Washington in 2010. The parties continued to follow the schedule of the parenting plan, even though it was based on the mother and daughter living in Arizona.

In 2013, the court entered a new parenting plan in which J.F-R resided with her father every other week from Thursday after school through Monday morning, and with her father from Wednesday after school through Thursday morning on the alternate week. The parties did not follow this plan closely. Instead, during cross-examination, the mother testified,

Q. [Isn't it true that you and] Pedro agreed approximately 4 1/2 years ago to disregard the parenting plan?

A. We agreed that he could have her extra days.

Q. Yes. And isn't it true that the extra days -- and you're using your phrase -- really amounted to an alternating week schedule with [J.F-R] changing residences on Fridays?

A. Correct.

Q. And isn't it true that the two of you followed that schedule for approximately four years until this past May?

A. No.

Q. Okay. Tell me when during the four years that you did not follow that schedule.

A. Like I mentioned before, you know, he will not pick her up right after school. He would show up seven, eight, nine p.m., so it's not a complete 50/50 parenting plan because she will still come home. I will have to do homework. I would have to feed her. I will have to take her to school. And, basically, only she's going to his house to sleep, so I wouldn't consider that a 50/50 plan.

The parents argued about J.F-R's residential schedule. In 2016, the parties disagreed about the father traveling with J.F-R to Puerto Rico for Christmas and the Puerto Rican celebration of Three Kings Day. They went to arbitration.

In June 2017, the mother served the father with a notice of intent of relocation, stating that she intended to move with J.F-R to North Carolina in August 2017. On July 19, 2017, the father filed an objection to the relocation. The court entered an order allowing the relocation and a temporary parenting plan. After a trial in December 2017, the court entered a final order, again granting the mother's relocation. The father moved for reconsideration. The trial court denied the motion for reconsideration as to the father's objection to relocation. But, the court granted the motion for reconsideration as to certain sections of its order, and entered an amended final order. The father appeals.

## DISCUSSION

The father makes essentially two arguments and challenges a number of the trial court's factual findings.[2] First, he argues that the trial court erred in applying the child relocation act (CRA), RCW 26.09.405-.560,[3] asserting that, because the parents shared equal residential time, neither parent was entitled to

---

[2] There are also a number of assignments of error in the father's opening brief that are unsupported by argument. When an assignment of error is "neither argued nor briefed," the reviewing court deems it waived. Kadoranian v. Bellingham Police Dep't, 119 Wn.2d 178, 191, 829 P.2d 1061 (1992).

[3] RCW 26.09.405 and .510 have been amended by Laws of 2019, ch. 46, § 5021 and § 5022 respectively. RCW 26.09.410, .430, and .520 have been amended by Laws of 2019, ch. 79, § 4, § 2, and § 3 respectively. The legislature also added a new section to the statute, defining "substantially equal residential time." LAWS OF 2019, ch. 79 § 1. These amendments are effective July 28, 2019. LAWS OF 2019, at ii (see (5)(a) setting out the effective date). They do not change the disposition of this case.

the statutory presumption allowing relocation. Second, he argues that the trial court erred in failing to consider and grant his petition for modification of the parenting plan. Last, we address the father's challenges to the trial court's findings of fact.

I. Standard of Review

This court reviews a trial court's relocation decision for abuse of discretion. In re Marriage of Jackson, 4 Wn. App. 2d 212, 217, 421 P.3d 477 (2018). A trial court abuses its discretion when it makes a manifestly unreasonable decision or bases its decision on untenable grounds or reasons. In re Marriage of Horner, 151 Wn.2d 884, 893, 93 P.3d 124 (2004). The trial court's findings of fact are treated as verities on appeal, so long as they are supported by substantial evidence. In re Marriage of Chandola, 180 Wn.2d 632, 642, 327 P.3d 644 (2014). Unchallenged findings of fact are verities on appeal. In re Estate of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004). "Substantial evidence" is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted. Id.

II. CRA

The CRA sets forth notice requirements and standards applicable to certain child relocation requests. RCW 26.09.430 provides, "[A] person with whom the child resides a majority of the time shall notify every other person entitled to residential time or visitation with the child under a court order if the person intends to relocate."[4] If an interested person objects, the trial court must then conduct a

---

[4] As amended, the statute will also apply to "a person with substantially equal residential time." LAWS OF 2019, ch. 79 § 2.

fact-finding hearing. <u>Jackson</u>, 4 Wn. App. 2d at 218. The CRA also provides "a rebuttable presumption that the intended relocation of the child will be permitted." RCW 26.09.520. The objecting person may rebut this presumption by showing that "the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person, based upon [11] factors." <u>Id.</u>

Here, the father asserts that the CRA presumption in favor of relocation does not apply. Relying on <u>Jackson</u>, the father asserts that the presumption permitting relocation applies only to a person with whom the child in fact resides a majority of the time. He contends that, in line with <u>Jackson</u>, where the child resides, rather than where she is scheduled to reside under the parenting plan, is the factual question that must be answered. 4 Wn. App. 2d at 220. And, he argues here that "the parties shared equal residential time . . . for more than [four] years. As a matter of fact, there was no 'majority parent.'" Finally, he asserts that the court erred in concluding that any factor under the CRA analysis deemed neutral must be resolved in favor of the relocating parent.

In regards to the informal parenting arrangement, the trial court found,

5. At some point the parties agreed to informally try a 50-50 parenting plan, where the child was to live with each parent for a week. The majority of the time, even during the father's "week," the mother picked up the child from school or daycare, helped with homework and fed the child dinner, and then the father would pick the child up after dinner for overnight at his residence. When the father had the child overnight, he would drop her off in the morning at the mother's apartment, and the child would catch the school bus from there. Despite the purportedly equal residential time, it appears that overall, the father was not as involved with the child's day-to-day activities as the mother.

6.  The theoretical week on / week off schedule continued until May 2017. At that time, the parties had a disagreement over the father's involvement and returned to the 2013 parenting plan provision of the father having every other weekend with the child. The mother had previously used threats of returning to the 2013 parenting plan to control behavior by the father of which she did not approve.

The father challenges the trial court's finding "that the father was not as involved with the child's day-to-day activities as the mother." This court will reverse the challenged finding of fact only if it is not supported by substantial evidence. In re Marriage of Griswold, 112 Wn. App. 333, 339, 48 P.3d 1018 (2002).

After the court entered a new parenting plan in 2013, the parties informally switched to a different arrangement. The mother testified,

A.  So we started with the parenting plan, and then he -- he did ask if he could have extra days. So, you know, I was like, [o]h, okay. You know, we can work that out. The problem is that he -- he wouldn't do exactly what he said.

So, for example, like on Thursdays, he wouldn't be able to pick her up because he play[s] -- I don't know if it's Frisbee or dodgeball. I think it is one of those. He plays games on Thursday in Seattle, so he would come about nine p.m. to pick her up.

So at that point, I said, [f]orget about Thursday because you come so late to pick her up.

And then he said, [o]kay. That's fine, so, you know, it was better for her to stay with me.

And then the rest of the days, she was always the one -- I was always the one picking her up, you know, and then she will come home from -- when she started middle school, then she would come home from the bus.

Like I say, I have my schedule so that I can get home as soon as she gets home, or between half an hour, an hour at the most, so I will spend all the afternoons with her. I will feed her, do homework, and then he would show up at random times. Sometimes he will show up at seven, eight, nine, whenever, and

then he would pick her up on his days. And then sometimes he would be, [o]h, I cannot take care of her this day, so it wasn't consistent.

I mean -- and so he will pick her up at, like I say, it could be seven, eight, or nine. So by the time he will pick her up, she had already been fed, she had already had homework done, she had already went [sic] to her activities, so basically, she was going to bed. Then she will wake up and he will bring her to my house to ride [the] bus to go to school.

. . . .

Q. Okay. So even when he had her overnight, he would bring her back to your apartment in the morning?

A. Yeah, and then she will ride the bus, and then she comes back home. So she was mainly at home. Like I said, she would leave late in the night, and then just go to bed. So they wouldn't do anything in the afternoon. She was still having dinner with me every day. Doing homework with me every day. Doing, you know, all her activities with me every day.

The father disagreed with the mother's recitation of their informal parenting schedule. He testified,

A. Particularly during elementary school, [J.F-R] was enrolled in before- and after-school. Janice would drop [J.F-R] off in the mornings, on her time, and then she would pick [J.F-R] up either right after school or at day care. Actually, she would pick her up at -- at -- you know, after-school day care, because you have to sign out for it many times. And I would pick her up at day care after school. And the day care was until 6[:00] p.m., so I would have to leave work at 5:00 so that I could make it before -- to -- before 6[:00] p.m. to pick her up. So -- and, particularly, when she was at day care, I could go pick her up directly from school.

. . . .

Q. Now, there came a point in time when [J.F-R] started participating in activities like gymnastics and dance. . . .

. . . .

Q. Did -- would Janice pick up -- take [J.F-R] to a dance class or a gymnastics class?

7

A. She would sometimes, yes. I'm not denying that.

Q. Okay. And would you pick [J.F-R] up when she was finished?

A. I would pick her up sometimes from when -- from the -- sorry, from the dance or gymnastics class afterwards on occasions, yes.

The father points to additional testimony. First, he mentions Jossymar Lamar, the mother's friend, who agreed that the mother and father followed a "week-on, week-off schedule" after 2014. The father also discusses testimony from his mother, Mayra Pritchard. Pritchard testified that, during her last visit in November 2016, the parenting schedule was one week with the mother and one week with the father. The father additionally mentions testimony from his father, Pedro Figueroa, Sr. Figueroa testified that his son "had been telling me for the last years [sic] that [J.F-R] was one week with him and one week with Janice and that's a matter of fact." And, the father recounts testimony from his girlfriend Kelsey Henan. During Henan's testimony, counsel asked,

Q. Before these legal proceedings started that we're in court for now, did Pedro ever discuss with you a desire to change the parenting plan that he had with Janice?

A. He did.

Q. And what did he tell you?

A. He wanted to make the 50/50 permanent.

Q. Do you have a sense of how long he and Janice had been following the 50/50 plan?

A. Almost since the last time they went to mediation and restated the parenting plan. When that time was, it wasn't long after that they had a handshake agreement to say, "We're going to go 50/50."

Q. Did -- from your perspective, did Pedro live up to his end of the bargain on the 50/50? Did he care for [J.F-R] 50 percent of the time?

A. Absolutely.

Q. Were there times when Pedro would care for [J.F-R] on days other than his residential time?

A. Yes.

Q. And do you recall the circumstances of that?

A. There were some occasions where her mom was traveling, and so Pedro would take her for a few of those -- or the time when her mom was gone, and then they would sort out, you know, the days, kind of shift the schedule back.

. . . .

Q. Do you recall -- was there a time when Janice and Pedro went -- changed the 50/50 plan they had been following and went back to the written terms of the parenting plan?

A. Yeah, that happened around the May/June time frame.

As long as substantial evidence supports a finding, it does not matter that other evidence may contradict it. In re Marriage of Burrill, 113 Wn. App. 863, 868, 56 P.3d 993 (2002). This court does not review the trial court's credibility determinations, nor can it weigh conflicting evidence. In re Marriage of Rich, 80 Wn. App. 252, 259, 907 P.2d 1234 (1996).

The mother testified that, even when the parents had an informal arrangement to alternate weeks with J.F-R, she did the majority of the parenting and was with J.F-R more than 50 percent of the time. Substantial evidence supports the trial court's finding that, "Despite the purportedly equal residential time, it appears that overall, the father was not as involved with the child's day-to-day activities as the mother."

9

The trial court did not abuse its discretion in concluding that the CRA presumption in favor of relocating applied to the mother.

III.   Modification of Parenting Plan

The father also argues that the trial court erred in failing to consider his petition to modify the parenting plan. He contends that, "[b]ecause the CRA does not apply, the court should have applied the criteria applicable to modification of [a] parenting plan." He further asserts that the trial court erred by considering the relocating parent's interest. The father relies on In re Marriage of Worthley, 198 Wn. App. 419, 424, 393 P.3d 859 (2017).

But, Worthley does not apply. In Worthley, the court held that "the CRA does not apply when the child's residential time is designated equal or substantially equal in the parenting plan and when the proposed relocation would result in a modification of this designation." 198 Wn. App. at 424. Because the mother had J.F-R for the majority of the time, under the parenting plan and in practice, the CRA applies here.

The father did not file a petition to modify the parenting plan until after the mother had served the father with a notice of her intent to relocate with J.F-R. The trial court properly analyzed the mother's intent to move as a relocation case. The trial court had the authority under the CRA to modify the parenting plan as part of the relocation action. Having done so, the trial court did not need to separately consider Pedro's modification petition. All issues were properly within the scope of the earlier filed CRA proceeding.

The trial court did not err in declining to grant the father's petition to modify the parenting plan.

## IV. Challenged Findings of Fact

The father makes a number of challenges to the trial court's findings of fact.

The trial court's findings of fact are treated as verities on appeal, so long as they are supported by substantial evidence. Chandola, 180 Wn.2d at 642. "Substantial evidence" is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted. Id. Unchallenged findings of fact are verities on appeal. Jones, 152 Wn.2d at 8.

### A. Factor 4.a—Relationships

The father first challenges three separate portions of the court's findings under the factor "Relationships: The children's relationships with each parent, any siblings, and other important people in the children's life."

In analyzing this factor, the trial court found,

> The child has a strong relationship with both parents, but appears to have a stronger attachment to the mother. The child is more emotionally reliant on the mother than she is on the father. The child and mother talk and text constantly. They sleep together. The child has no siblings. She spends a significant amount of time with relatives in North Carolina. She is in frequent contact with her aunt and uncle, and her grandparents lived temporarily with the child and her mother. The child spent substantially less time with her maternal uncle when living in Washington than she does with her maternal relatives while living in North Carolina. The child's relationship with the father's girlfriend, Kelsey, is not a strong relationship, although it is improving.

> This factor favors relocation.

11

The father disputes the portion of the finding, "'[The child] appears to have a stronger attachment to the mother. The child is more emotionally reliant on the mother than she is on the father.'" He asserts that "there is no evidentiary basis for this finding." He argues that this finding contradicts another finding, "The court is concerned about the mother's use of corporal punishment on a child this age, about her belief that her child is simply a 'liar' rather than one who may need emotional help, and about her use of demeaning language toward the child." And, he claims that this finding is at odds with testimonies of witnesses who attested to the strong bond between the father and J.F-R.

The two findings do not contradict one another. In an unchallenged finding, the court stated, "The child and her mother are very close, appearing to be more so than is typical for a child [J.F-R]'s age. They appear to be in constant contact during the day." Based on an analysis of cell phone records, the mother testified that the daughter called and texted her more than she did the father. She explained that the daughter sent her text messages about "[p]retty much everything. I mean, even like she's always letting me know, like, Hey, I got to school. I'm coming back. How you [sic] doing? I love you. You know, like how's work? Just -- yeah. We talk about pretty much everything." The finding that the child has a closer attachment to the mother is not incongruous with testimony that the child has a close relationship with her father. Both can be true. Substantial evidence supports the trial court's finding that the child is more emotionally reliant on the mother than the father.

The father challenges second the portion of the finding that "her grandparents lived temporarily with the child and her mother." The father concedes that the grandparents were temporarily in the mother's house with J.F-R. But, he argues that, because they were there only temporarily, it should not have been a factor upon which relocation was based.

There is nothing factually inaccurate about the trial court's statement that the grandparents lived temporarily with the mother and child. It is one sentence in a long paragraph analyzing many different relationships between the child and others. The father's argument fails.

The father challenges third the portion of the finding, "[T]he child spent substantially less time with her maternal uncle when living in Washington." He asserts, "Prior to relocation, [J.F-R] spent far more time with her uncle in Washington compared to the time spent with her mother's aunt and uncle in North Carolina."

The mother testified that she saw her brother four times in the year before she moved. The mother's uncle, J.F-R's great uncle, testified that, in North Carolina, he and his wife see J.F-R twice a week for visits. The court found, "[The child] spends a significant amount of time with relatives in North Carolina. She is in frequent contact with her aunt and uncle, and her grandparents lived temporarily with the child and her mother. The child spent substantially less time with her maternal uncle when living in Washington." This statement appears to compare the amount of time J.F-R spent with her uncle in Washington to the amount of time

she spends with her great uncle, great aunt, and other family after moving to North Carolina.

Substantial evidence supports the finding.

B. Factor 4.c—Contact

Next, the father disputes a portion of the trial court's finding under the "[c]ontact" factor. He argues that the court's statement, "'Even when in Washington, the child's contact with her father [over the years] was somewhat sporadic and for shorter periods'" is unsupported by evidence.

The trial court found,

Disrupting the children's contact with the moving parent would be more harmful to them than disrupting their contact with the non-moving parent.

As noted, the court finds the child is unusually emotionally connected to the mother. Even when in Washington, the child's contact with her father over the years was somewhat sporadic and for shorter periods. Disrupting the contact between her mother and the child would be more harmful than disrupting the contact with her father.

This factor favors relocation.

The father argues that the parties followed a "'50/50'" residential schedule prior to the mother's notice of intent to relocate, and that his contact was not "'somewhat sporadic' or drastically shorter." The mother testified,

I have my schedule so that I can get home as soon as she gets home, or between half an hour, an hour at the most, so I will spend all the afternoons with her. I will feed her, do homework, and then he would show up at random times. Sometimes he will show up at seven, eight, nine, whenever, and then he would pick her up on his days. And then sometimes he would be, [o]h, I cannot take care of her this day, so it wasn't consistent.

Testimony from the record supports the trial court's finding.

14

C. Factor 4.e—Reasons for Moving

The father challenges a portion of the trial court's finding under the factor, "Reasons for moving."

The trial court found,

The reasons for moving were given in good faith.

The mother's Notice of Relocation was filed soon after a serious falling out with the father. This is a concern given the timing and the mother's previous use of the 2013 parenting plan as a manipulative weapon against the father. There is evidence the mother had thought about moving for some time, however. She stated she wanted "a better life," lower cost of living, and to be near her relatives in North Carolina. She represented to the court that she was buying a home that, in fact, was not available for sale. She spent money on trips and a car rather than saving for a house down payment. However, she drained her retirement savings and was able to purchase a different house in North Carolina. She clearly could not afford to buy an acceptable home in Washington, close to the father, and she is in fact nearer her relatives and sees them often. In total, the court finds the mother acted in good faith.

The father disagrees with the statement, "'She clearly could not afford to buy an[] acceptable home in Washington, close to the father.'" Citing two of his exhibits, the father argues that he offered evidence of homes that the mother could have afforded in his neighborhood.

Regarding the first home the father offered, the mother testified that, when she looked at the home, she saw that it was a doublewide manufactured home in a neighborhood of mobile homes. She does not want to live in that type of home. She additionally testified about a house in Snoqualmie that the father offered, which was 890 square feet and cost $370,000. And, she testified about another house that the father offered, which was foreclosed and in an area that was

15

"completely devastated," for the price of $358,000. While there may have been houses the mother could have potentially afforded, she did not find them acceptable.

In contrast, the mother purchased her home in North Carolina for $230,000. It is almost 2,200 square feet. Her mortgage payment is $1,526.87 per month.

Substantial evidence supports the trial court's finding that the mother could not afford to buy an acceptable home in Washington, close to the father.

D. Factor 4.g—Children

Next, the father challenges two findings under the factor the trial court labeled "Children." First, he disputes the finding, "The data — including the child's home environment, the extended family in North Carolina, the relationships with her extended family in North Carolina, and how she is doing in school and her extracurricular activities — indicate the move has been positive for the child." The father contends that there is "scant evidence" to support this finding.

The father asserts that, since the move, J.F-R's grades in school have declined. Her more recent progress reports show a couple of her grades that are below a B. But, she also had a grade below a B before the move. The mother testified,

> She's about the same. Like here, she got a C. You know, right now she got [sic] a 78 in math, and I know math she has struggled with it on the past. But other than that, you know, her grades are like A[s] and Bs, so it's kind of about the same.

As for the home environment and extracurricular activities, the trial court stated in an unchallenged finding, "In North Carolina, the child lives with her mother

16

in a house with a backyard. She is active in sports and activities in North Carolina, as she was in Washington." Above, we discussed the strength of the child's relationships with her family in North Carolina. Given the totality of this data, the trial court's finding is supported by substantial evidence.

Second, the father challenges the trial court's finding,

> The child has become embedded in Fayetteville, North Carolina. She has made friends, in both school and her extra activities. She has her own bedroom and play space in her home. She is now used to visiting her mother's relatives and hanging out at her aunt and uncle's house, where there is a pool. Moving back to Washington would involve living with her father and his girlfriend, about whom she is ambivalent, in pleasant surroundings but leaving her friends and activities in Fayetteville. She did have friends and activities in Washington when she lived in Washington.

> These scenarios both have positive and negative aspects. The factor is therefore neutral as to relocation.

The father asserts that "[t]here is no evidence to support [the] statement as to how the child can become embedded in only 3 1/2 months in North Carolina as compared to nearly 10 years in Washington." His challenge to the finding focuses on J.F-R's living situation with her father and the activities she could resume if she returned to Washington. His argument does not dispute the fact that the court found that the child is doing well in North Carolina. The mother testified about J.F-R's activities, including dance class and gymnastics, and the friends that she has made in North Carolina.

Substantial evidence supports the trial court's finding.

### E. Factor 4.i—Other Arrangements

The father challenges the trial court's finding, "The father has already traveled twice to North Carolina on a monthly basis, and has the finances and some flexibility to do so." The trial court also found, "He has usable vacation time, although the trip to North Carolina uses up four or five days at a time. He has a flexible work schedule and can do work on the plane or in North Carolina." The father argues that he does not have enough vacation time for all of the monthly visits, and that it is a burden for him to travel every month.

Testimony supports the trial court's finding that, at the time of trial, the father had visited J.F-R twice since she moved. To support his assertion that he does not have enough vacation time for the monthly visits, the father cites three exhibits which are not in the record before this court. The father has a long-term job with Microsoft. While it is plausible that traveling is a significant burden, the trial court also found, "The child talks to her father frequently. There are no limitations on her talking with her father. [I]t is possible for the father to keep a strong relationship with the child, [albeit with] less in-person visitation time."

Substantial evidence supports this finding.

### F. Factor 4.j—Alternatives

The father challenges the trial court's finding, "The mother has relocated and essentially has no savings." The father argues that the mother purchased a home before the motion for relocation was settled, and that the mother's risk in doing so should not be a factor favoring relocation.

Under this finding, the court stated, "This factor disfavors relocation." It is not clear what the trial court means. It might mean, as it says, that the factor disfavors the mother's relocation. Or, it might mean that, because the mother had already relocated, this weighed in her favor and against her relocating back to Washington. Pursuant to RCW 26.09.520, there is a rebuttable presumption that the mother's relocation would be permitted. The trial court had previously granted the temporary relocation.

This factor should not have weighed in the mother's favor. On appeal, we cannot conclude that the trial court determined that this was in the mother's favor, because the order states otherwise.

G. Factor 4.k—Financial

Finally, the father argues that the trial court erred in finding that the financial impact of moving "[d]oes not apply."

The trial court found that the financial impact and logistics of moving was a factor that did not apply because the move had already occurred. The father asserts that the factor should have disfavored relocation because "[t]he court failed to evaluate the adverse financial impact from relocation." The mother testified about the positive impact the move had on her finances, explaining that she is saving $1,000 a month by living in North Carolina. The father's argument in that regard fails. Additionally, the father argues that the mother should not gain an advantage for purchasing a home before the issue of relocation had been resolved. But, the trial court did not give her an advantage on this factor. It found, "This factor is neutral."

19

The trial court did not err in finding that the factor did not affect its analysis because the move had already occurred.

## V. Attorney Fees

The mother requests attorney fees on appeal "based on need and ability to pay an amount to be decided by the court." She fails to cite authority supporting her request, contrary to RAP 18.1(b). RAP 18.1(b) requires argument and citation to authority to advise us of the appropriate grounds for an award of attorney fees and costs. Osborne v. Seymour, 164 Wn. App. 820, 866, 265 P.3d 917 (2011). This requirement is mandatory. Id. This requirement also demands more than a bald request for attorney fees on appeal. Id. Thus, we deny the mother's request for attorney fees on appeal based on her failure to comply with the RAP.

We affirm.

Appelwick, C.J.

WE CONCUR:

Chun, J.

Verellen, J.